952 F.2d 742
 60 USLW 2440
 Nicholas R. AMATO, County Executive of the County of Essex,
County of Essex, a Body Politic and Corporate of
the State of New Jersey
v.
Robert N. WILENTZ, Individually and in His Official Capacity
as Administrative Head of the New Jersey Judiciary
Systems.
Robert N. Wilentz, Appellant in 91-5045 and 91-5289.
County Executive of Essex County (formerly Nicholas R. Amato
and currently Thomas J. D'Alessio) and the County
of Essex, Appellants in 91-5072.
 Nos. 91-5045, 91-5072 and 91-5289.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 30, 1991.
Decided Dec. 30, 1991.
 
 Robert J. Del Tufo, Atty. Gen. of N.J., Douglas S. Eakeley (argued), First Asst. Atty. Gen., Benjamin Clarke, Deputy Atty. Gen., Trenton, N.J., for appellant in 91-5045 and 91-5289.
 H. Curtis Meanor (argued), Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello, Edward F. Lamb, Edward A. Hartnett, Robinson, St. John & Wayne, Newark, N.J., for appellant in 91-5072.
 Gail R. Henningsen, Mercer County Counsel, Trenton, N.J., amicus curiae for appellants in 91-5072.
 Before BECKER, HUTCHINSON and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 Acting as administrator of the New Jersey judicial system, New Jersey Supreme Court Chief Justice Robert N. Wilentz ("the Chief Justice") refused to allow Warner Brothers to use several New Jersey courthouses to film a scene for the movie "Bonfire of the Vanities." The Chief Justice based his decision on the ground that the scene (which depicted African-Americans rioting in a courtroom against a perceived judicial injustice) offensively stereotyped blacks and might undermine their "already vulnerable" confidence in the state judiciary. One of the courthouses to which Warner Brothers specifically sought access was the old Essex County Courthouse in Newark, New Jersey. To induce Essex County to consent to the use of the courthouse, Warner Brothers had offered to donate $250,000 to the Courthouse Restoration Fund.
 Faced with the threat of an injunction against filming in the Essex County Courthouse, Warner Brothers proceeded to shoot the scene elsewhere. Essex County and County Executive Nicholas R. Amato (collectively "the County") thereupon brought suit in the district court for the District of New Jersey under 42 U.S.C. § 1983 (1988) against Chief Justice Wilentz individually and in his official capacity as administrator of the New Jersey judiciary.[1] The County claimed that Chief Justice Wilentz violated Warner Brothers' First Amendment rights and caused the County to lose $250,000 in revenue. The County sought damages, declaratory relief, and attorneys' fees. Warner Brothers neither joined the suit nor took any public stand on it, and the Chief Justice sought dismissal on the ground that the County lacked standing to raise Warner Brothers' rights.
 After the suit was filed but before decision was rendered, Chief Justice Wilentz altered the procedure for handling courthouse filming requests so that a nonjudicial committee would review the proposals according to an official policy and would determine whether to permit filming. Because the County elected not to challenge the new system directly, the Chief Justice argued that the claims for prospective relief were moot even if the damages claim was live. The County disagreed, contending that under the new policy, applications could still be denied for identical reasons, and that studios would lack incentive to challenge the denials; in the County's view, the declaratory relief claim was live because essentially similar violations were capable of repetition yet evading review.
 The parties also hotly disputed the First Amendment issues. Addressing the County's motion for summary judgment and the Chief Justice's cross-motion for dismissal or summary judgment, the district court ruled that (1) the County had third party standing to assert Warner Brothers' claims; (2) the declaratory relief claim was not moot; (3) the Essex County Courthouse was the relevant "forum" for First Amendment purposes, and it was a "designated public forum" for filmmaking; (4) the Chief Justice violated the First Amendment by discriminating on the basis of content in a manner not narrowly tailored to further a compelling state interest; (5) the Chief Justice also violated the First Amendment by discriminating based on viewpoint; and (6) the Chief Justice was not entitled to Eleventh Amendment or absolute judicial immunity, but he was entitled to qualified immunity from damages because he did not violate clearly established law.
 Chief Justice Wilentz appealed, pressing every defense he raised before the district court. The County cross-appealed, claiming that the Chief Justice was not entitled to qualified immunity from damages. The district court subsequently awarded attorneys' fees to the County under 42 U.S.C. § 1988 (1988), thereby rejecting Chief Justice Wilentz's objections that qualified immunity and the Eleventh Amendment foreclosed the award, that the County did not substantially prevail, and that the fees were excessive in any event. The Chief Justice appealed the attorneys' fees ruling as well, and we consolidated the appeals.
 For the reasons that follow, we hold that the County lacked third party standing to raise the First Amendment rights of Warner Brothers. We will therefore set aside both the judgment on the merits and the attorneys' fees award, and we will direct the district court to dismiss the case. Because our holding bars all the County's claims, we need not decide whether the declaratory judgment claim was still live, whether the Chief Justice violated the First Amendment, or whether attorneys' fees would have been appropriate.
 I. FACTS AND PROCEDURAL HISTORY
 The relevant facts are essentially undisputed. Before 1988, the New Jersey state judiciary had no formal written policy governing the use of state courthouses for commercial filmmaking, but under prevailing practice such requests were referred to the Chief Justice for approval. In 1988, the judiciary adopted a formal policy which confirmed the existing practice: judges in the various vicinages were to "consult" with the Chief Justice before consenting to commercial uses of courtrooms. No statistics were kept before 1988, but a 1989 survey showed that the Chief Justice approved seven of twelve requests to film in state courthouses that year.
 In mid-April 1990, Warner Brothers sought access to the Essex County Courthouse to film a brief "walking" scene for its movie adaptation of Tom Wolfe's novel, Bonfire of the Vanities.[2] The Chief Justice approved the request, finding the proposed scene "innocuous." In late April 1990, Warner Brothers apparently sought to film the climactic scene from "Bonfire" in the federal courthouse in Newark, but the request was denied for reasons not disclosed in the record. Warner Brothers then contacted officials in several New Jersey counties possessing old courthouses (including Ocean and Somerset Counties, but not Essex County) about filming the scene in their county courthouses. Those officials, consistent with the established policy, contacted the Chief Justice's office, and Chief Justice Wilentz turned down Warner Brothers' request.
 In the scene in question, the trial judge (portrayed by African-American actor Morgan Freeman) dismisses an indictment against the main character, an upper-middle-class white man accused of running over a young black man with a car, and thereby provokes the predominantly black audience to riot over the racism of the criminal justice system and to chase the judge and the defendant from the courtroom. According to Chief Justice Wilentz's later press release and affidavit, he based his denial of the filming request on his beliefs that African-Americans might resent the state judiciary's having supplied the setting for the scene, and that his approval might "seriously undermine" the black community's "already vulnerable" confidence in the state judiciary. He specifically cited the scene's portrayal of black people "acting in a riotous, lawless and life-threatening manner" and its depiction of them "in the worst possible stereotype."
 Theodore Fetter, Deputy Director of New Jersey's Administrative Office of the Courts, notified Warner Brothers of the rejection on April 30, 1990, although he may not have told Warner Brothers exactly why permission was denied. Warner Brothers contacted Fetter several times to seek reconsideration of the Chief Justice's decision, and at one point even offered to pay a higher than normal fee or to make a sizeable charitable donation. Fetter repeatedly advised Warner Brothers that the decision was final, although the record does not make clear whether Warner Brothers understood that the decision applied to all New Jersey state courthouses.
 In any event, Warner Brothers soon thereafter contacted then-Essex County Executive Nicholas Amato and sought to film the same courthouse riot scene in the old Essex County Courthouse in Newark. Warner Brothers was under time pressure to film the scene right away because Freeman had other, upcoming dramatic commitments, which Warner Brothers was contractually obligated to respect. Warner Brothers therefore agreed with County Executive Amato to donate $250,000 (far in excess of the County's normal fees) to the Essex County Courthouse Restoration Fund for the right to film at the courthouse on evenings and weekends beginning May 9, 1990. Apparently, Warner Brothers did not advise Essex County of the Chief Justice's earlier ruling. On May 8, 1990, County Executive Amato notified Essex County Assignment Judge Burrell I. Humphreys of the request and agreement. Judge Humphreys, following the official policy, notified Chief Justice Wilentz, who instructed Judge Humphreys to reject the request. The Chief Justice also directed Judge Humphreys to enjoin filming of that scene in the courthouse, the order to be enforceable by the sheriff.
 The injunction proved unnecessary because Warner Brothers' general counsel John A. Schulman notified Judge Humphreys by telephone that Warner Brothers would film the scene in New York beginning that night instead, which it did. Despite the apparent mootness of an injunction against Essex County, the County nonetheless obtained a hearing before Judge Humphreys, where the County argued that the Chief Justice's actions violated the First Amendment and were capable of repetition, yet would evade review with respect to further scenes from the same film. Because the County had yet to notify the state judiciary of any further filming requests, Judge Humphreys found the injunction issue before him (relating to that evening's filming) moot. He suggested that if Essex County remained aggrieved it should file a declaratory judgment action in due course.
 A public uproar ensued. County Executive Amato complained to the press about Chief Justice Wilentz's actions, and the Chief Justice responded with a public statement defending what he did.[3] Nevertheless, on May 11, 1990, Warner Brothers requested permission to film a different scene at the old Essex County Courthouse. In this scene, a continuation of the courthouse riot scene, the main character escapes from the rioting mob along with the judge. Chief Justice Wilentz advised Warner Brothers that it could film the parts of the escape scene that did not depict a rioting black mob, but that it would have to film the rest of the scene (containing such depictions) elsewhere. He issued another press release explaining his decision.[4] Warner Brothers then proceeded to shoot the escape scene elsewhere.
 On May 16, 1990, the County brought this action under 42 U.S.C. § 1983 (1988) in the District Court for the District of New Jersey. The County averred that the Chief Justice had violated the First Amendment and sought both damages and declaratory or injunctive relief. The next day, the Chief Justice created an advisory committee (known as the Martin Committee, after its chairman, Judge Ralph Martin) to recommend a policy on commercial filming in county courthouses. In the interim before the committee completed its study, commercial filming was suspended. On July 5, 1990, the Martin Committee reported, recommending that policies regarding off-hour filming be left to county option without statewide content restriction, thereby removing the state judiciary from the process altogether.
 On October 18, 1990, the Chief Justice agreed with the recommendation to remove the state judiciary from the process but rejected the county option recommendation; instead he established a statewide nonjudicial committee to handle filming requests. He specifically included content guidelines, instructing the permit committee to deny permission for courthouse use "if it finds that granting permission poses a significant risk of loss of confidence in the judiciary or of diminishing the public's respect for the courtroom or courthouse as a symbol of the rule of law, or of the values served by a judiciary." Particularly noted as posing such risks were pornographic films (legally obscene or not), "[f]ilms that concern highly controversial current issues, upon which the public may be divided into severely antagonistic groups," partisan political films, and films so offensive to particular groups as to threaten their confidence in the judiciary (including those with "a devastating stereotype of a racial, ethnic, or religious group"). The Chief Justice stated that he would review the committee system after one year.
 On October 24, 1990, the County moved for summary judgment. On October 26, 1990, the Chief Justice cross-moved, seeking dismissal of the complaint because (1) the County lacked standing to raise all its claims or (2) the damages claim was barred by the Eleventh Amendment and by immunity doctrines under 42 U.S.C. § 1983 (1988), while the declaratory and injunctive claims were moot. In the alternative, the Chief Justice moved for summary judgment on all claims on the ground that his actions did not violate the First Amendment.
 On December 18, 1990, the district court ruled on the motions in a written opinion. See Amato v. Wilentz, 753 F.Supp. 543 (DNJ 1990). The court first held that Essex County had third party standing to assert Warner Brothers' First Amendment rights. Id. at 549-51. It also ruled that the claims for prospective relief were not moot, even though the filming of "Bonfire of the Vanities" was complete and the Chief Justice had established a new permit system, which the County had expressly declined to challenge. Id. at 551-52. In the district court's view, the Chief Justice's actions were capable of repetition, yet evading review, hence not moot. Id. at 552.
 On the merits, the court held that the old Essex County Courthouse, and not all state courthouses, was the appropriate "forum" for purposes of constitutional analysis. Id. at 552 n. 8. It did not directly address (although it implicitly rejected) the Chief Justice's contention that "forum analysis" did not apply at all because Warner Brothers sought the courthouse not as a forum for communication but essentially as a stage prop. The court then concluded that the old Essex County Courthouse was a "designated public forum" for filmmaking, id. at 554-56, and that therefore the Chief Justice's content-based restrictions were unconstitutional because they were not necessary to further a compelling governmental interest, id. at 556-59. Moreover, the district court continued, even if the Essex County Courthouse were a nonpublic forum, the Chief Justice nevertheless violated the First Amendment by engaging in forbidden "viewpoint discrimination." Id. at 559-60.
 The district court entered a declaratory judgment in favor of the County. But although the court held that the Chief Justice was not protected by Eleventh Amendment or absolute judicial immunity, id. at 560-61, the court nonetheless ruled that the Chief Justice had not violated "clearly established law" and was therefore entitled to qualified immunity from damages, id. at 562. The court noted, however, that the Chief Justice was now on notice; hence good-faith immunity would not be available in the future. Id. On the same day, as a result of the district court's ruling, the Chief Justice suspended all further commercial filmmaking in state courthouses.
 Cross-appeals to this court followed, the Chief Justice essentially reiterating his positions before the district court, and the County arguing that the district court had erred in finding the Chief Justice immune from a damage award. Before oral argument on the merits appeal, the district court considered the County's application for $41,133.54 in attorneys' fees under 42 U.S.C. § 1988 (1988). Chief Justice Wilentz objected that qualified immunity and the Eleventh Amendment barred the award, and that in any event, Essex County did not substantially prevail in real world terms: the County won no damage award, and after the court's original ruling, the Chief Justice exercised his authority to bar all filming in New Jersey courthouses, leaving would-be filmmakers and their licensor counties worse off than before. The Chief Justice also argued that the fees awarded were excessive. The district court approved the full request, however, in an unpublished opinion. The Chief Justice's second appeal, which we consolidated with the earlier appeals, followed.
 II. THIRD PARTY STANDING
 A. The Contentions of the Parties
 Chief Justice Wilentz first contends that Essex County lacks standing to raise each of its claims. He does not argue that the County lacks Article III standing to bring the claims, nor could he, for the County certainly alleges actual and threatened injury (loss of revenue) that is fairly traceable to the defendant's action and that could be redressed by a favorable decision on the merits.[5] See Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Rather, the Chief Justice observes that the County claims only that it was injured by his violation of the rights of Warner Brothers, which is not a party in this case. Importantly, the County does not claim that the Chief Justice violated the County's own First Amendment rights.[6] We must therefore decide whether the plaintiffs have third party standing, also known as jus tertii.
 
 
 1
 The parties' positions, in brief, are these: Chief Justice Wilentz argues that third party standing is generally disfavored, recognized only where the third party faces an obstacle to its own suit and where the plaintiff's interests coincide with the nonsuing third party's. In his view, Warner Brothers could easily have sued but deliberately chose not to, possibly because it presciently feared what in fact transpired as a result of the suit: a blanket ban on commercial filming. He also stresses that considerations of federalism and comity weigh heavily against according third party standing to a county to sue the state of which it is a subordinate governmental unit.
 
 
 2
 The County responds that courts routinely allow sellers who lose money because of violations of their customers' constitutional rights to assert claims on their customers' behalf, obstacle or not. Moreover, it notes, courts have long relaxed third party standing rules in First Amendment cases because of censorship's chilling effect on others not before the court. Finally, the County submits, Warner Brothers had no incentive to sue because it was on a tight schedule and succeeded in filming the scenes elsewhere with little if any monetary loss.
 
 
 3
 B. General Principles of Third Party Standing
 
 
 4
 The longstanding basic rule of third party standing is that "in the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." Powers v. Ohio, --- U.S. ----, 111 S.Ct. 1364, 1370, 113 L.Ed.2d 411 (1991). The rule serves at least two judicial purposes. First, the rule fosters judicial restraint: courts faced with unsettled questions avoid pronouncements that are perhaps unnecessary and undesirable because the rightholders do not wish to assert their rights. See Secretary of State of Maryland v. Munson, 467 U.S. 947, 955, 104 S.Ct. 2839, 2846, 81 L.Ed.2d 786 (1984); Singleton v. Wulff, 428 U.S. 106, 113-14, 96 S.Ct. 2868, 2873-74, 49 L.Ed.2d 826 (1976) (plurality opinion). Second, the rule assures concrete, sharp presentation of the issues and enables courts to avoid ruling on abstract grievances. Generally, the third party will be the best advocate of its own position, and the plaintiff may place a slightly different, self-interested "spin" on its presentation. See Munson, 467 U.S. at 955, 104 S.Ct. at 2846; Singleton, 428 U.S. at 114, 96 S.Ct. at 2874.
 
 
 5
 The general rule against third party standing is not ironclad, however. The rule does not reflect an Article III "Case or Controversy" requirement, but stems from prudential concerns. See, for example, Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 623 n. 3, 109 S.Ct. 2646, 2651 n. 3, 105 L.Ed.2d 528 (1989); Hodel v. Irving, 481 U.S. 704, 711, 107 S.Ct. 2076, 2080, 95 L.Ed.2d 668 (1987); Craig v. Boren, 429 U.S. 190, 193, 97 S.Ct. 451, 454, 50 L.Ed.2d 397 (1976). Accordingly, in limited circumstances where the policies supporting the general rule are not served, the Supreme Court has approved third party standing. See Singleton, 428 U.S. at 114-15, 96 S.Ct. at 2874. Where rightholders are unable to raise their own rights and their relationship with the plaintiff suggests an identity of interests, courts can be more certain that the litigation is necessary and that the issues will be framed clearly and effectively. See id. at 114-16, 96 S.Ct. at 2874-75. Moreover, other policy considerations, notably the fear of chilling expression in First Amendment cases, may at times outweigh the policies behind the general rule against third party standing. See, for example, Munson, 467 U.S. at 956-60, 104 S.Ct. at 2846-48.
 
 
 6
 The Supreme Court has thus recognized the dangers inherent in third party standing, yet has also recognized that third party standing may at times be appropriate. While the Justices have frequently disagreed on the proper outcomes in third party standing cases, the Court's opinions do give federal courts rather clear guidance on what factors are relevant in determining whether to make an exception to the general rule. Where a plaintiff asserting third party standing has suffered concrete, redressable injury (that is, the plaintiff has Article III standing), federal courts are to examine at least three additional factual elements before allowing the suit to proceed. Caplin & Drysdale, 491 U.S. at 623 n. 3, 109 S.Ct. at 2651 n. 3. First, the court must examine the relationship between the plaintiff and the third party whose rights are asserted; second, the court must consider the ability of the third party to advance its own rights--whether some obstacle impedes the rightholder's own suit; and third, the court must inquire into the impact on third party interests--whether the plaintiff and the third party have consistent interests. Id.
 
 
 7
 The Supreme Court has been less clear, however, about what to do with these factors. Its jurisprudence contains seemingly inconsistent strains about whether the factors, especially the "obstacle" factor, are in fact prerequisites to third party standing, or whether courts are instead to balance them. In some cases, the Court has explicitly or implicitly held that an obstacle to the rightholder's suit is not an absolute requirement for third party standing. In Caplin & Drysdale, for example, the Court held that a lawyer had third party standing to raise the Sixth Amendment rights of a client when challenging a statute that might have inhibited the client from paying his attorneys' fees. The Court concluded that even though a criminal defendant suffers no serious obstacles to advancing his or her own claim, the other two factors weighed strongly enough that the lawyer had standing. Id. Similarly, the Court has held that in First Amendment overbreadth challenges, the danger of chilling expression is so important that the showing of an obstacle is not required. Munson, 467 U.S. at 957, 104 S.Ct. at 2847 ("Although [failure to show an obstacle] might defeat a party's standing outside the First Amendment context, this Court has not found the argument dispositive in determining whether standing exists to challenge a statute that allegedly chills free speech."). See also Virginia v. American Booksellers Ass'n, 484 U.S. 383, 392-93, 108 S.Ct. 636, 642, 98 L.Ed.2d 782 (1988) (no inquiry into obstacle in summarily upholding booksellers' standing to raise bookbuyers' First Amendment rights in facial challenge to statute).
 
 
 8
 On the other hand, in Powers v. Ohio, which upheld the standing of a litigant to raise the Equal Protection claims of jurors peremptorily challenged due to their race, the Court's language seemed to require certain showings from would-be third party claimants:
 
 
 9
 We have recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied: the litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute ...; the litigant must have a close relation to the third party ...; and there must exist some hindrance to the third party's ability to protect his or her own interests....
 
 
 10
 111 S.Ct. at 1370-71 (citations omitted).[7] Despite this language, however, we very much doubt that the Court in Powers intended silently to overrule its standing holdings in cases such as Caplin & Drysdale, Munson, and American Booksellers, especially in a case where it in fact allowed third party standing. Rather, the discussion in Powers may merely reflect that where, as in Powers, all three conditions exist, the Court will recognize third party standing.
 
 
 11
 Furthermore, the Caplin & Drysdale balancing approach has the virtue of incorporating the strength of the showings on each factor. For example, obstacles to suit do not come in one size. Even if an obstacle to the third party's suit exists, surely the severity of the hindrance is relevant. Similarly, the extent of potential conflicts of interests between the plaintiff and the third party whose rights are asserted matters a good deal. While it may be that standing need not be denied because of a slight, essentially theoretical conflict of interest, we have held that genuine conflicts strongly counsel against third party standing. See Polaroid Corp. v. Disney, 862 F.2d 987, 1000 (3d Cir.1988).
 
 
 12
 In short, we read the body of Supreme Court precedent as (1) identifying factors that are relevant to determining third party standing and (2) rendering an overall balance of factors dispositive.[8] Moreover, we do not read the list of factors in Powers and Caplin & Drysdale as exhaustive; in some cases, other factors may also be relevant to the ultimate prudential decision. For example, the Supreme Court has considered First Amendment cases different (or at least courts must balance differently) because of the overarching fear of chilling expression. We too will consider the potential chilling in this case, even though Essex County's claim is not a conventional one of statutory overbreadth. Another factor we believe that the Court would deem relevant is whether hearing a suit between state governmental units may conflict with federal courts' traditional federalism concerns about interfering with essentially state matters. We will therefore address that consideration also. All the while we will bear in mind that third party standing is exceptional: the burden is on the County to establish that it has third party standing, not on the defendant to rebut a presumption of third party standing.
 
 C. Obstacles to Warner Brothers' Own Suit
 
 13
 We turn to the first consideration: whether obstacles blocked Warner Brothers' own suit. When the person whose rights were allegedly violated is impeded from bringing his or her own suit, courts cannot be assured that the rightholder believes that the right is not in fact at stake or is unimportant, and so a usual reason for denying third party standing may not hold. Singleton, 428 U.S. at 116, 96 S.Ct. at 2875. Obviously, a legal or physical inability to bring suit qualifies as an obstacle. For example, in Hodel v. Irving, 481 U.S. at 711-12, 107 S.Ct. at 2080-81, the Court ruled that Indian plaintiffs had standing to assert that their decedents' right to pass property at death had been statutorily taken without just compensation. The dead certainly could not assert their own rights, and the Court noted that because the statutory executor (the Secretary of the Interior) was charged with enforcing the statute, he could "hardly be expected to assert [plaintiffs'] rights." Id. at 711, 107 S.Ct. at 2081.
 
 
 14
 But the cases do not insist on an absolute impossibility of suit. At the other end of the spectrum, a practical disincentive to sue may suffice, although a mere disincentive makes for a less persuasive showing than an affirmative impediment. For example, just last Term in Powers v. Ohio, 111 S.Ct. at 1372-73, the Supreme Court noted that although a juror unconstitutionally excluded from a venire has the legal right to sue on his or her own behalf, as a practical matter such challenges are rare because the practical obstacles are daunting. Declaratory or injunctive relief against a particular prosecutor is unlikely because the violation is unlikely to recur, and the financial stake in the litigation is small relative to the costs of litigation. The Court concluded that a litigant has third party standing to raise an excluded venireperson's rights in part because the juror "possess[es] little incentive to set in motion the arduous process needed to vindicate his own rights." Id. at 1373.
 
 
 15
 Similarly, in Singleton v. Wulff, 428 U.S. at 115-18, 96 S.Ct. at 2874-76, the plurality held that doctors had standing to raise their patients' claims that a statute restricting abortion funding violated their constitutional rights. Justice Blackmun's opinion noted that a woman's concern for privacy might disincline her from suing, and that each woman's case would be physically, although not legally, mooted. The plurality conceded the dissent's point that those obstacles were not insurmountable (a pseudonymous or class action suit was possible, and a woman who gave birth might press her claim as "capable of repetition yet evading review"), but held that the doctors had standing nonetheless.
 
 
 16
 Here, Warner Brothers certainly faced no legal impediment to its own suit; the only question is whether it lacked sufficient practical incentive to sue. As Essex County notes, Warner Brothers was in a time bind and it easily located an acceptable alternative locale. But the change in venues must have inconvenienced Warner Brothers somewhat. More significantly, Warner Brothers is a major motion picture studio, and because movies with legal themes or courthouse scenes have become quite common, a precedent denying filming based on objectionable scene content might well disturb it.[9] From a prospective perspective, then, Warner Brothers did have some and probably much reason to sue.
 
 
 17
 In sum, Warner Brothers faced no affirmative obstacle to suing. While it may have had limited practical incentive to sue, that disincentive was hardly so overwhelming that it weighs significantly in favor of third party standing.
 
 
 18
 D. The Relationship Between Warner Brothers and Essex County and The Consistency of Their Interests
 
 
 19
 The cases also search for a "relationship between the litigant and the third party ... such that the former is fully, or very nearly, as effective a proponent of the right as the latter." Powers, 111 S.Ct. at 1372 (quoting Singleton, 428 U.S. at 115, 96 S.Ct. at 2874). Standing is more likely if the plaintiff has some sort of relationship "of special consequence" with the third party, Caplin & Drysdale, 491 U.S. at 623 n. 3, 109 S.Ct. at 2651 n. 3, such as doctor-patient as in Singleton, 428 U.S. at 117, 96 S.Ct. at 2875, or lawyer-client as in Caplin & Drysdale, 491 U.S. at 623 n. 3, 109 S.Ct. at 2651 n. 3, and United States Dep't of Labor v. Triplett, 494 U.S. 715, 720-21, 110 S.Ct. 1428, 1432, 108 L.Ed.2d 701 (1990) (lawyer has third party standing to challenge a fee restriction by raising client's due process rights). In such cases, the plaintiff and the third party are more likely to share the same concerns, and the strength of advocacy of the third party's rights will not be diluted. See also Frissell v. Rizzo, 597 F.2d 840, 849 (3d Cir.1979) ("[Intimate relationships] provide strong circumstantial guarantees of community of interest.").
 
 
 20
 But a close personal relationship is neither necessary nor sufficient for third party standing. Even a close relative will not be heard to raise positions contrary to the interests of the third party whose rights he or she claims to represent: the litigant would then hardly be a vigorous advocate of the third party's position. See, for example, Gilmore v. Utah, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976) (convicted murderer's mother could not seek stay of execution where murderer himself knowingly and intelligently waived his right to appeal). Moreover, the relationship between the third party and the plaintiff only counts insofar as it is linked to the right asserted, for it is when "the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue [that] the court can at least be sure that its construction of the right is not unnecessary...." Singleton, 428 U.S. at 114-15, 96 S.Ct. at 2874.
 
 
 21
 The key aspects of the "relationship" prong are thus a common link to the right asserted, consistency of the parties' interests, and effective advocacy--not the intimacy of the relationship per se. Hence the Supreme Court in Powers v. Ohio concluded that a litigant has third party standing to raise the rights of an excluded juror even though the two do not know each other personally. 111 S.Ct. at 1372 (voir dire establishes bond of trust between party and juror; both have common interests in eliminating racial discrimination from the courtroom and maintaining confidence in the judicial system). Similarly, and perhaps most relevantly to this case, the Court has frequently found that "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market." Craig v. Boren, 429 U.S. at 195, 97 S.Ct. at 456. See also Eisenstadt v. Baird, 405 U.S. 438, 443-46, 92 S.Ct. 1029, 1033-34, 31 L.Ed.2d 349 (1972) (distributor of contraceptives may raise rights of unmarried distributees). As Justice Scalia recently wrote for the Court in Triplett:
 
 
 22
 When ... enforcement of a restriction against the litigant prevents a third party from entering into a relationship with the litigant (typically a contractual relationship), to which relationship the third party has a legal entitlement (typically a constitutional entitlement), third party standing has been held to exist.
 
 
 23
 494 U.S. at 720, 110 S.Ct. at 1432.
 
 
 24
 The market access cases are consistent with the general standards of third party standing. In such cases, the right that the seller is asserting (the buyer's right to buy) is inseparably linked with the vendor-vendee market relationship. Also, the seller and an aggrieved would-be buyer ordinarily have identical interests. Moreover, because the vendor's monetary interests are greater, it has more incentive to sue, and its advocacy will be at least as vigorous as the vendee's. Of course, a nominal plaintiff could be sought and a class action brought, but recognizing third party standing instead costs little in terms of effective advocacy because the claim would be representative anyway. Singleton, 428 U.S. at 117-18, 96 S.Ct. at 2875-76; Craig, 429 U.S. at 194, 97 S.Ct. at 455.
 
 
 25
 Applying these principles to this case, Warner Brothers and Essex County certainly do not have an intimate familial or advisorial relationship, but that is not dispositive. And the licensor-licensee relationship between Essex County and Warner Brothers is analogous to the vendor-vendee relationship in Craig and the distributor-distributee relationship in Eisenstadt. But just as the general rule against third party standing does not apply where its assumptions do not hold, Singleton, 428 U.S. at 114-15, 96 S.Ct. at 2874, so a usual exception to that general rule should not apply where its assumptions do not hold. In this case, a critical assumption behind the market access exception summarized in Triplett--namely, an identity of interests--does not obtain.[10]
 
 
 26
 In most vendor-vendee or other commercial relationships we can assume that the interests of the vendor and vendee fully (or nearly fully) coincide when a sale is prevented. Here, however, Warner Brothers' interests potentially diverged from the County's in important ways. No doubt, Warner Brothers' ultimate preference for free (or at least non-viewpoint-discriminatory) access to film scenes in courthouses is congruent with the County's preference. And the County, as much as Warner Brothers, is probably displeased at the eventual result of the suit (the banning of all filming): Essex County will lose revenue and Warner Brothers has lost a filming venue.
 
 
 27
 But it does not follow that the two's views coincided at the time suit was brought. Essex County had suffered a large and certain financial loss, while its future losses from the suit failing or resulting in a Pyrrhic victory were speculative. Although the County too must have (or at least should have) considered the possibility of legal victory leading to an across-the-board ban on filming instead of unrestricted filming, surely the definite $250,000 injury loomed large compared to the possible future costs of a decision to ban all filming. In contrast, Warner Brothers had suffered little past injury and may have been much more concerned that the suit would fail in court (creating an undesirable legal precedent) or backfire in practice. Additionally, for a variety of reasons, Warner Brothers may simply not have wanted to ruffle the feathers of the New Jersey judiciary any further, especially when approaching the County after the Chief Justice's initial rejection at least appeared devious.
 
 
 28
 Furthermore, as noted above, in most cases the seller expects many repeated sales to different customers. The seller therefore has a greater monetary interest at stake than each individual customer, who have limited incentives to sue. Customers' comparatively limited incentive may also underlie the general exception allowing sellers to sue on behalf of their customers. The transaction here was singular, however, and, as noted above, Warner Brothers possessed more than a typical customer's incentive to sue.
 
 
 29
 In sum, Warner Brothers' decision not to sue might have been due solely to its limited incentives to sue (as the County suggests). But more likely, Warner Brothers was skeptical about the legal merits of the suit or had concerns about the costs and risks involved (as the Chief Justice argues). Most probably, all these considerations entered into Warner Brothers' calculus. Thus, although the County's advocacy of its own interests has been quite competent and extremely vigorous, we fear that the County may not have adequately advocated Warner Brothers' interests.[11] In such circumstances, we are disinclined to allow third party standing, absent strong countervailing factors in favor of it. See also Polaroid, 862 F.2d at 1000 (genuine conflict of interest "weighs heavily against" third party standing); Frissell, 597 F.2d at 848-49 (risk of conflict of interest is important, though not dispositive, factor against third party standing).
 
 
 30
 E. Factors Unique to First Amendment Litigation
 
 
 31
 One such countervailing factor might have been the First Amendment basis of this suit. The Supreme Court rather freely grants standing to raise overbreadth claims, on the ground that an overbroad statute or regulation may chill the expression of others not before the court. See, for example, American Booksellers, 108 S.Ct. at 642; Munson, 467 U.S. at 956-60, 104 S.Ct. at 2846-48. In such cases, application of ordinary third party standing rules "would have an intolerable, inhibitory effect on freedom of speech." Eisenstadt v. Baird, 405 U.S. at 445 n. 5, 92 S.Ct. at 1034 n. 5.
 
 
 32
 In this case, the County argues that Chief Justice Wilentz's decision has had the effect of deterring not only Warner Brothers but all other would-be filmers of movies with controversial scenes or themes from making films in real courthouse surroundings. While the County concedes that any such chill might be limited to New Jersey courthouses, in the County's view, even that geographically limited chill poses too much of a threat to free expression. The County also contends that the chill is not merely theoretical, but actually demonstrated. It notes that no studios sought permission to film in New Jersey courthouses between the Chief Justice's decision not to permit filming of the "Bonfire" scene and his subsequent suspension of all commercial filming. The Chief Justice counters that even if the County's factual claim is true (it cited no record basis), virtually all filming in New Jersey had come to a halt because a key union was on strike.
 
 
 33
 At all events, the overbreadth cases are not on point here. The County does not challenge a statute, a regulation, or even a general policy of the New Jersey judiciary. Rather, it complains about a specific ruling. Before the Chief Justice's "Bonfire" decision, no general policy about the content of films existed. After this litigation began, the Chief Justice did implement a new permit committee system that contained general policies that could conceivably face First Amendment challenge on grounds of overbreadth and inhibition of expression. But the County deliberately and explicitly chose not to challenge the committee system, even when the district court suggested that possibility.
 
 
 34
 In our view, if Essex or another county (or better, a filmmaker) had brought a challenge to the permit committee system, the overbreadth cases might well counsel in favor of according third party standing.[12] But here the County is not suing to vindicate the rights of filmmakers in general; instead it raises the rights of one third party (Warner Brothers). Having made that strategic choice, the County cannot now complain when we inquire into whether Warner Brothers could have brought the claim itself and whether the County's interests conflict with Warner Brothers'. There are significant First Amendment concerns at stake in this case, including chilling concerns not directly raised by the complaint. But we must also concern ourselves with proper adversarial presentation of the claims that the County's complaint does actually raise. Accordingly, we do not believe that in this case First Amendment considerations trump our other concerns about recognizing third party standing.
 
 
 35
 F. Effect of the County Versus State Nature of the Suit
 
 
 36
 Federalism is the final factor that we think necessary to consider. Chief Justice Wilentz strongly presses upon us the federal courts' longstanding reluctance to inject themselves into intra-state-government disputes. Here, of course, a county (a subdivision of the state) is suing the state's Chief Justice (the head of a branch of state government). In the Chief Justice's view, of all the possible representatives to bring a third party action against a state officer, a county is among the least appropriate.
 
 
 37
 In support of that position, the Chief Justice cites case law dating from Trustees of Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518, 660-61, 4 L.Ed. 629 (1819), which holds that counties, municipalities, and other subdivisions cannot assert constitutional claims against their own state governments. See, for example, Williams v. Mayor & City Council of Baltimore, 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015 (1932) (municipality, as creation of the state, may not invoke constitutional privileges or immunities against its creator); City of New York v. Richardson, 473 F.2d 923, 929 (2d Cir.1973); City of South Lake Tahoe v. California Tahoe Regional Planning Agency, 625 F.2d 231, 233 (9th Cir.1980). Judicial support for this rule may be waning with time. See, for example, City of South Lake Tahoe v. California Tahoe Regional Planning Agency, 449 U.S. 1039, 1041-42, 101 S.Ct. 619, 620-21, 66 L.Ed.2d 502 (1980) (White, joined by Marshall, dissenting from denial of certiorari); Rogers v. Brockette, 588 F.2d 1057, 1067-71 (5th Cir.1979). But the rule may remain the law of the land, at least absent state waiver, which is probably not present here.[13] The upshot is that under current law, at least, Essex County probably could not succeed in suing the Chief Justice for violating its own rights of free expression.
 
 
 38
 Of course, that is not this case: the County does not sue to vindicate its own First Amendment rights. But the Chief Justice argues that those cases, which frequently recite that counties and cities have no "standing" to sue their states, are also relevant to the question of third party standing. Although we agree with the County that these cases may not be standing cases (in the modern sense of the term) but instead holdings on the merits, see Rogers v. Brockette, 588 F.2d at 1067-71, we agree with the Chief Justice that the cases nevertheless reflect the general reluctance of federal courts to meddle in disputes between state governmental units. That reluctance must certainly factor into our prudential balance.
 
 
 39
 The County contends that this case involves a First Amendment claim, not a dispute over the structure of state government (where federalism implications are especially severe). But the case is also essentially about how the New Jersey judiciary controls access to and use of its own courthouses. While we are not endorsing a policy of federal court abstention from all suits between state governmental actors, we also do not wade into such frays enthusiastically, and we must be certain not to adjudicate them unnecessarily.
 
 G. The Ultimate Balance
 
 40
 In ultimately balancing the factors, we return to the purposes of the general rule against third party standing. In this case, it is quite possible that the district court pronounced unnecessarily on a rather difficult constitutional issue of first impression. Warner Brothers' claim may never have come before any court if the County had not raised it. Our concern is heightened because Warner Brothers had only minor obstacles to its own suit, and we perceive significant potential conflicts of interest between it and the County--conflicts which may mean that the County's zealous advocacy of its own case was not an adequate presentation of Warner Brothers' position regarding its rights. When we also factor in federalism concerns and bear in mind that third party standing is exceptional, the balance is clearly tipped, and we conclude that the plaintiffs here lacked third party standing to raise Warner Brothers' First Amendment rights.
 
 III. CONCLUSION
 
 41
 We hold that Essex County and its county executive lack third party standing to sue for harm caused by Chief Justice Wilentz's alleged violation of the First Amendment rights of Warner Brothers. Because that holding applies to all claims in the plaintiffs' complaint, we will vacate both the judgment of the district court with respect to the merits and its order for attorneys' fees, and we will direct the district court to dismiss the complaint. Costs will be taxed against County Executive Amato and the County of Essex.
 
 
 
 [1]
 Amato is no longer Essex County Executive. The current County Executive is Thomas D'Alessio, and pursuant to FRAP 43(c), his substitution as a party is automatic. However, because the case has been widely publicized under the original caption, the parties (and we) continue to use the original caption to avoid confusion
 
 
 [2]
 The Essex County Courthouse was built early in this century, and its classic beauty has kept it in demand for various artistic uses at least since 1982. It has served as the filming location for scenes from numerous movies, including "Rage of Angels," "Rage of Angels II," "She-Devil," "Presumed Innocent," and "Jacob's Ladder." The television productions "Invasion of Privacy," "The Firm," and "48 Hours" were also filmed there, as was a music video, "L.L. Cool J." Before the "Bonfire" dispute, no requests to film there had been denied
 
 
 [3]
 The statement read:
 Permission to utilize a New Jersey courtroom to film a particular scene for the production, "Bonfire of the Vanities," has been denied because its use could serve to seriously undermine the confidence of black citizens in our court system.
 The scene, involving black persons acting in a riotous, lawless and life-threatening manner, could very easily raise questions concerning why a New Jersey courtroom would be used for such a purpose.
 Encouraging the confidence of the movie industry in our court system is not as important as risking the confidence of those whose confidence in it is, for many reasons, already vulnerable.
 Should permission be granted, it would not be difficult to reach the conclusion that those responsibile for justice in New Jersey do not care how blacks are portrayed or that they are unaware or unconcerned with such a portrayal.
 It is not our desire to pass judgment on the artistic merits of the film; rather, it is our feeling that the assumed advantages of allowing a courtroom to be used for this particular scene are outweighed by the risk of identifying New Jersey's court system with a portrayal which will erode the confidence of black citizens in our system of justice.
 We have no desire to impede or advance this film. That is none of our business. But confidence in our justice system, confidence in our awareness of the sensitivities and concerns of blacks about our justice system, is very much our business.
 
 
 [4]
 The May 13, 1990 press release read:
 Chief Justice Robert N. Wilentz today reiterated his denial of permission to use an Essex County courtroom to film a scene from the movie, "Bonfire of the Vanities," because of its portrayal of minority citizens, but said he would grant access to the courthouse to the production company for a different scene if certain changes are made. [The scene is then described.] ...
 "I will not permit a New Jersey courthouse, courtroom or corridor to be used to portray blacks as having so little respect for law they would riot and threaten a judge's life," Wilentz said.... The Chief Justice said that if the movie company will remove the part of the scene which involves one of the actors slamming shut an iron gate to keep the mob of blacks at bay, he would drop his prohibition.
 "I have absolutely no objection to the proposed scene involving conversation in the corridor between judge and defendant, nor do I have any concern over the dialogue which passes between the two actors," Wilentz said. "However, the continued portrayal of minority citizens in rioting and threatening behavior, in my view, erodes the confidence of minority citizens in our system of justice and sends the clear message to the minority community that those of us responsible for the administration of justice in this state do not care about how blacks are portrayed."
 
 
 [5]
 As the County's able counsel so pithily put it at oral argument:
 If Warner Brothers had not been deprived of its First Amendment right to make this picture or scenes therefrom in the Old Essex County Courthouse, the county treasury would have been enriched by something in excess of a quarter of a million dollars. That is our standing. We want the money.
 
 
 [6]
 Even if Essex County could plausibly claim that the Chief Justice interfered with its own freedom of expression, there remains some doubt whether the County, as a creature created by New Jersey, could assert federal constitutional rights against its maker. We discuss this in connection with general considerations of federalism. See Part II.F at 754-55
 
 
 [7]
 In this section of Powers, the Court did not specifically mention the third Caplin & Drysdale prong (effect on third parties' interests), but the opinion's later discussion of the relationship prong incorporated it. Below we will follow the same approach of combining these closely linked factors
 
 
 [8]
 Our decision to apply the more flexible balancing approach may conflict with the apparent requirement of a showing of an obstacle in Frissell v. Rizzo, 597 F.2d 840, 848 (3d Cir.1979). Even in Frissell, however, we acknowledged exceptions to that rule. We noted (and distinguished) cases such as Craig v. Boren, where vendors of 3.2% beer were held to have standing to assert the equal protection rights of 18-to-21-year-old men not allowed to purchase that beer--despite no substantial obstacle to the men's own suit. See 597 F.2d at 848 n. 7. The County claims that as a would-be licensor asserting its licensee's rights, it escapes the general dictate in Frissell. At all events, we agree with the County that subsequent Supreme Court cases such as Munson, Caplin & Drysdale, and Powers, have superseded Frissell's analysis on this point. For the same reason, we are not bound by the statement in Bowman v. Wilson, 672 F.2d 1145, 1152-53 (3d Cir.1982), that showings of an obstacle and of a close relationship are requirements for third party standing
 
 
 [9]
 Naturally, Warner Brothers might have been even more worried about a legal precedent upholding such a policy, or about a backlash from bringing or eventually winning the suit. In other words, Warner Brothers may have had a strategic reason not to sue. We discuss this and other potential conflicts of interest between Warner Brothers and Essex County below in Part II.D at 751-53. For now, we limit our discussion to the obstacle issue
 
 
 [10]
 Triplett merely states that "third-party standing has been held to exist " in market access cases. 494 U.S. at 720, 110 S.Ct. at 1432 (emphasis added). Triplett does not say that third party standing always exists when a litigant seeks to raise the legal right of a third party to establish a market relationship with the litigant
 
 
 [11]
 Unfortunately, we do not know what Warner Brothers' view of Essex County's suit is in fact. Warner Brothers neither sued the Chief Justice on its own, nor joined Essex County's suit, nor indicated any opposition to Essex County's suit. In short, it has done nothing
 We cannot agree with the Chief Justice that when Warner Brothers declined to join ranks with Essex County in the injunction hearing before Judge Humphreys, Warner Brothers necessarily disavowed Essex County's First Amendment argument. On the other hand, we cannot assume a congruity of interests between Essex County and Warner Brothers, either. In Frissell, for example, this court noted that a newspaper's decision not to bring suit against the mayor of Philadelphia "reflect[ed] a considered judgment as to its most advantageous course of action," which suggested a conflict of interest with the plaintiff, a reader asserting the newspaper's rights. 597 F.2d at 848. Here too we fear that Warner Brothers' failure to join an action of which it was no doubt aware may reflect a tactical disagreement between it and Essex County.
 
 
 [12]
 Of course, we do not decide that issue, which is not before us here. If a county sued, we would still face the federalism and comity concerns discussed in the next subsection
 
 
 [13]
 This court has held that the traditional rule does not necessarily apply to suits against state agencies where, as here, NJ Stat Ann 40:18-3 (West 1991), the state has bestowed upon a subdivision the power to sue and be sued. Allegheny County Sanitary Auth. v. United States EPA, 732 F.2d 1167, 1173 n. 3 (3d Cir.1984). But that state waiver exception may not apply here, for New Jersey courts continue to disallow counties to assert constitutional claims against the state. See State v. Rosenman, 183 N.J.Super. 137, 443 A.2d 719, 722 (App.Div.1982)