PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 12-3200/3201
_____

In Re: The Majestic Star Casino, LLC, et al,
                                        Debtors

The Majestic Star Casino, LLC, et al.

v.

Barden Development, Inc;
United States of America on behalf
of the Internal Revenue Service; State of Indiana
Department of Revenue; John M. Chase, Jr., as
Personal Representative of Don H. Barden

United States of America on behalf
of the Internal Revenue Service,
                        Appellant No. 12-3200

Barden Development, Inc and
John M. Chase, Jr., as Personal
Representative of Don H. Barden,
                        Appellants No. 12-3201
_____

On Appeal from the United States Bankruptcy Court
for the District of Delaware
(B.C. No. 10-56238)
Bankruptcy Judge:  Hon. Kevin Gross
_____

Argued
February 19, 2013

Before:   AMBRO, JORDAN, and VANASKIE, *Circuit Judges*.

(Filed: May 21, 2013)
_____

Kathryn Keneally
Thomas J. Clark
Ivan C. Dale   [ARGUED]
Tax Division
Department of Justice
P.O. Box 502
Washington, DC   20044

Melissa L. Dickey
United States Department of Justice
Tax Division
P.O. Box 227
Ben Franklin Station
Washington, DC   20044

Charles M. Oberly
United States Attorney
1007 N. Orange Street
Wilmington, DE   19801
    *Counsel for Appellants*
    *The United States of America*

Steven D. Carpenter
100 North Senate Avenue
Indianapolis, IN   46204
    *Counsel for Appellant*
    *Indiana Department of Revenue*

Mary F. Caloway
Buchanan Ingersoll & Rooney
1105 N. market St. - #1900
Wilmington, DE   19801

Gerald M. Gordon   [ARGUED]
Erika Pike Turner
Gordon Silver
3960 Howard Hughes Pkwy – 9th Fl.
Las Vegas, NV   89169

Anthony Ilardi, Jr.
Katherine Murphy
William Lentine
Dykema Gossett, PLLC
39577Woodward Avenue - #300
Bloomfield Hills, MI   48304
*Counsel for Barden Appellants*

Lauren O. Casazza   [ARGUED]
Warren Haskel
Kirkland & Ellis
601 Lexington Avenue
New York, NY  10022

Kathleen P. Makowski
James E. O'Neill, III
Pachulski Stang Ziehl & Jones
919 N. Market Street – 17th Fl.
Wilmington, DE   19801
 *Counsel for Appellees*

————————————

OPINION OF THE COURT

————————————

JORDAN, *Circuit Judge*.

This case arises from a corporate reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Code"), and puts at issue whether a non-debtor company's decision to abandon its classification as an "S" corporation for federal tax purposes, thus forfeiting the pass-through tax benefits that it and its debtor subsidiary had enjoyed, is void as a postpetition transfer of "property of the bankruptcy estate," or is avoidable, under §§ 362, 549, and 550 of the Code.  This appears to be a question of first impression in the federal Courts of Appeals.

Barden Development, Inc. ("BDI"), John M. Chase, as the personal representative of the estate of Don H. Barden[1] (together with BDI, the "Barden Appellants"), and the Internal Revenue Service (the "IRS") appeal an order of the United States Bankruptcy Court for the District of Delaware granting summary judgment to The Majestic Star Casino, LLC and certain of its subsidiaries and affiliates (collectively "Majestic" or the "Debtors") on their motion to avoid BDI's termination of its status as an "S" corporation (or "S-corp"), an entity type that is not subject to federal taxation. In November 2009, the Debtors, which had been controlled by Barden, filed petitions for relief under Chapter 11 of the Code. After the bankruptcy filing, Barden, as sole shareholder of BDI, successfully petitioned the IRS to revoke BDI's S-corp status. Under the Internal Revenue Code ("I.R.C."), that revocation also caused Majestic Star Casino II, Inc. ("MSC II"), an indirect and wholly-owned BDI subsidiary and one of the Debtors, to lose its status as a qualified subchapter S subsidiary (or "QSub"), which meant that it, like BDI, became subject to federal taxation.

The Debtors were by then effectively controlled by their creditors and, naturally, did not agree with shouldering a new tax burden. They filed an adversary complaint asserting that the revocation of BDI's S-corp status caused an unlawful postpetition transfer of property of the MSC II bankruptcy estate. The Bankruptcy Court agreed and ordered the Barden Appellants and the IRS to reinstate both BDI's status as an S-

---

[1] Don H. Barden died on May 19, 2011. His personal representative was substituted for him in this action in July 2011. For simplicity, Don H. Barden and Mr. Chase are referred to in this opinion as "Barden."

corp and MSC II's status as a QSub. The case was certified to us for direct appeal. For the reasons that follow, we will vacate the Bankruptcy Court's January 24, 2012 order and remand this matter to the Court with directions to dismiss the complaint.

## I.    BACKGROUND

### A.    *Facts*

#### 1.    *The Parties*

Defendant-Appellant BDI is an Indiana corporation with its headquarters in Detroit, Michigan. Defendant-Appellant Barden was, at all pertinent times, the sole shareholder, chief executive officer, and president of BDI. At the time of the complaint, BDI qualified as a "small business corporation" under I.R.C. § 1361(b), and, presumably at Barden's direction, had elected under I.R.C. § 1362(a) to be treated as an S-corp for purposes of federal income taxation. As an S-corp, BDI was not subject to federal taxation, *see* I.R.C. § 1363(a),[2] or state taxation.[3] Rather, its income and

---

[2] The Internal Revenue Code presumes that a business entity incorporated under any federal or state statute is taxable as a "C" corporation, the letter designation having reference to the subchapter of the I.R.C. which governs the tax treatment of various corporate transactions and interests. *See, e.g.*, I.R.C. §§ 331-346 (covering corporate liquidations); *id.* §§ 351-368 (corporate organizations and reorganizations); *id.* § 385 (treatment of corporate interests as stock or indebtedness); Treas. Reg. § 301.7701-2(a), (b) (defining a business entity that is "recognized for federal tax purposes").

6

losses were passed through to its shareholder, Barden, who was required to report BDI's income on his individual tax returns. *See* I.R.C. §§ 1363(b), 1366(a).[4]

---

Subchapter S of the I.R.C. creates an exception for a business entity that qualifies as a "small business corporation" and whose shareholder or shareholders elect S-corp status for that entity. *See* I.R.C. § 1361(a) (providing that any corporation is a taxable C-corporation unless it qualifies for, and elects, S-corp status); *id.* § 1362(a) (providing for the "S" election). To qualify as a small business corporation, the business entity must be a domestic corporation that does not have more than 100 shareholders, has only individual persons as shareholders, does not have a nonresident alien as a shareholder, and has only a single class of stock. *Id.* § 1361(b). As discussed in more detail *infra*, an S-corp is a "disregarded entity" for federal tax purposes and is not taxed on its income. *Id.* § 1363(a); *see also* Treas. Reg. § 301.7701-3(c)(v)(C) (providing that an entity that elects S-corp status is treated as an "association" rather than as a corporation for tax purposes so that only its shareholders are taxed on the entity's income).

[3] Indiana follows the federal entity classification rules for state tax purposes, so that an entity classified as an S-corp for federal tax purposes is automatically classified as such for Indiana state tax purposes. Ind. Code Ann. § 6-3-2-2.8(2). BDI was therefore treated as a disregarded entity by Indiana tax authorities as well.

[4] An S-corp is sometimes referred to as a "pass-though" or "flow-through" entity because the entity itself pays no tax but its income, deductions, losses, and credits flow-through to its shareholders, who must report those amounts in their personal income tax returns. *United States v.*

Plaintiff-Appellee MSC II is a Delaware corporation that owns and operates the Majestic Star II Casino and the Majestic Star Hotel in Gary, Indiana. MSC II generates income from those operations. BDI acquired MSC II in 2005 and was, at all times relevant to this dispute, the ultimate owner of 100 percent of its stock.[5] Prior to the Debtors' bankruptcy petition, BDI elected to treat MSC II as a QSub for federal tax purposes, pursuant to I.R.C. § 1361(b)(3)(B).[6]

---

*Tomko*, 562 F.3d 558, 576 n.14 (3d Cir. 2009) (en banc).

[5] MSC II was a wholly-owned subsidiary of The Majestic Star Casino, LLC, which in turn was wholly-owned by Majestic Holdco, LLC. BDI owned 100 percent of the stock of Majestic Holdco, LLC. Due to the 100 percent tiered ownership of Majestic Holdco, LLC and The Majestic Star Casino, LLC, those intermediate subsidiaries are treated as "disregarded entities" for federal income tax purposes, *see* Treas. Reg. § 307.7701-3(b)(ii), and BDI is treated as the owner of MSC II.

[6] The 1996 amendments to the I.R.C. enacted as part of the Small Business Job Protection Act of 1996, Pub. L. No. 104-188, 110 Stat. 1755, introduced QSubs as a new tax entity. An S-corp may elect QSub status for its subsidiary if (1) the S-corp parent holds 100 percent of the subsidiary's stock, (2) the subsidiary is otherwise eligible to qualify as an S-corp on its own, but for the fact that it has a corporate shareholder, and (3) the S-corp parent makes the appropriate election on IRS Form 8869. *See generally* The S Corporation Handbook § 2:6 (Peter M. Fass & Barbara S. Gerrard, eds. 2012). Treasury regulations provide that a QSub is generally not treated as a corporation separate from its S-corp parent.

8

That meant that MSC II was not treated as a separate tax entity from BDI, but rather that all of its assets, liabilities, and income were treated for federal tax purposes as the assets, liabilities, and income of BDI. *See id.* § 1361(b)(3)(A). As a result, MSC II paid no federal taxes and all of its income and losses flowed through to Barden (through BDI), and he was required to report them on his individual tax returns. *See* Treas. Reg. § 1.1366-1(a). BDI was able to elect to treat MSC II as a QSub because the latter met the statutory requirement that it was wholly owned by an S-corp, ultimately BDI. *See* I.R.C. § 1361(b)(3)(B); *supra* notes 5 and 6.

2.      *The Majestic Bankruptcy and the Revocation of MSC II's QSub Status*

On November 23, 2009 (the "Petition Date"), MSC II and the other Debtors filed voluntary petitions for bankruptcy relief under the Code, and the Bankruptcy Court subsequently ordered that their Chapter 11 cases be jointly administered. The Debtors became debtors-in-possession of their respective

Treas. Reg. § 1.1361-4(a)(1). If an S-corp makes a valid QSub election with respect to an existing subsidiary, as in this case, the subsidiary is deemed to have liquidated into the parent under I.R.C. §§ 332 and 337. Treas. Reg. § 1.1361-4(a)(2). If a subsidiary ceases to qualify as a QSub – for example, because its corporate parent is no longer an S-corp – the subsidiary is treated as a new corporation acquiring all of its assets (and assuming all of its liabilities) from the parent S-corp immediately before termination, in exchange for stock of the new subsidiary corporation, under I.R.C. § 351. I.R.C. § 1361(b)(3)(C); Treas. Reg. § 1.1361-5(b).

9

bankruptcy estates, and thus had, with limited exceptions not relevant here, all of the powers and duties of a bankruptcy trustee in a Chapter 11 case. At the Petition Date, both BDI and MSC II retained their status as, respectively, an S-corp and a QSub. Barden and BDI did not file bankruptcy petitions, nor did they participate as debtors in any of the petitions at issue in this case.

In addition to certain events that automatically revoke an entity's election to be treated as an S-corp,[7] that tax status may also be revoked if more than half of the corporation's shareholders consent to the revocation. I.R.C. § 1362(d)(1)(B). If S-corp status is revoked, the entity cannot elect such status again within five years of the revocation without the consent of the Secretary of the Treasury. *Id.* § 1362(g).[8]

Sometime after the Petition Date, Barden, BDI's sole shareholder, caused and consented to the revocation of BDI's

---

[7] Those events include the purchase of the company's stock by more than 100 shareholders, by a shareholder who is not a natural person, or by a shareholder who is a nonresident alien, I.R.C. § 1361(b)(1)(A)-(C), or the company's issuance of more than one class of stock, *id.* § 1361(b)(1)(D). Any of those events cause the S-corp to lose its required status as a "small business corporation."

[8] Like an S-corp that elects to revoke or otherwise loses its S-corp status, *see* I.R.C. § 1362(g), a QSub that loses its QSub status is not eligible for that status again for five years, without the consent of the Secretary or the IRS, *id.* § 1361(b)(3)(D); Treas. Reg. § 1.1361-5(c)(1).

10

status as an S-corp, and BDI filed a notice with the IRS to that effect. The revocation was retroactively effective to January 1, 2010, the first day of BDI's taxable year.[9] As a result, MSC II's QSub status was automatically terminated as of the end of the prior tax year (the "Revocation"), because it no longer met the requirement that it be wholly owned by an S-corp. Thus, both BDI and MSC II became C-corporations as of January 1, 2010. As a consequence of becoming a C-corporation, MSC II became responsible for filing its own tax returns and paying income taxes on its holdings and operations.

Neither BDI nor Barden sought or obtained authorization from the Debtors or from the Bankruptcy Court for the Revocation. The Debtors did not learn of the Revocation until July 19, 2010, which is believed to be at least four months after Barden and BDI filed the S-corp revocation with the IRS. *See supra* note 9. The Debtors allege that, because MSC II was not informed of the Revocation, it was unaware that it had a new obligation to report and pay income taxes. They also allege that, due to the change in MSC II's tax status, MSC II had to pay approximately $2.26 million in estimated income tax to the Indiana Department of Revenue for 2010 that it otherwise

---

[9] It is not clear from the record at what point during the pendency of the Majestic bankruptcy proceedings BDI revoked its S-corp status. However, it presumably did so before March 15, 2010, because the revocation was effective on the first day of 2010 and would otherwise have been effective on the first day of 2011. *See* I.R.C. § 1362(d)(1)(C) (setting forth the effective dates for revocation of S-corp status).

11

would not have had to pay.  However, as of April 2011 (the first date federal taxes would have been due following the Revocation), the Debtors had paid no federal income taxes as a result of the Revocation.

### 3. *Confirmation of the Majestic Plan and Its Effect on MSC II*

On December 10, 2010, prior to the Debtors' filing of the adversary complaint that initiated this action, the Bankruptcy Court issued an order permitting the Debtors to convert MSC II from a Delaware corporation to a Delaware limited liability company ("LLC").  On March 10, 2011, the Court entered an order confirming the Debtors' Second Amended Plan of Reorganization (the "Plan").  Pursuant to the Plan, as of December 1, 2011 (the "Effective Date"), new membership interests representing all of the equity interests in MSC II were to be issued to holders of certain senior secured debt. On November 28, 2011, just prior to the Effective Date, the Debtors went ahead and caused MSC II to convert to an LLC.  That conversion meant that MSC II would no longer have qualified for QSub status, even if the Revocation had not already occurred.  *See* I.R.C. § 1361(b)(3)(B) (requiring that a QSub be a "domestic corporation").[10]  Also, as part of the

---

[10] An LLC may opt to elect to be taxed as a partnership, *see* Treas. Reg. § 301.7701-3(c), so the conversion of MSC II to an LLC effectively reinstated its status as a "flow-through" entity.  But the conversion of MSC II, at that time a C-corporation as a result of the Revocation, into an LLC may itself  have been a taxable event to the extent the conversion could have been treated as a corporate liquidation. *See* I.R.C. § 336.  The Debtors were aware of the

12

Plan of Reorganization, MSC II ceased to be wholly owned by an S-corp, so that, even absent the LLC conversion, and independent of the Revocation, MSC II would no longer have qualified as a QSub. The Debtors' Plan of Reorganization was substantially consummated on December 1, 2011, and MSC II emerged from bankruptcy together with the other Debtors on that date.

B.    *Procedural History*

On December 31, 2010, the Debtors filed an adversary complaint in the Bankruptcy Court, asserting that the Revocation caused an unlawful postpetition transfer of MSC II's estate property, in violation of §§ 362 and 549 of the Bankruptcy Code. The complaint sought recovery of that "property" under Code § 550, through an order "directing the IRS and [the] Indiana [Department of Revenue] to restore BDI's status as an S corporation and MSC II's status as a QSub retroactively effective January 1, 2010." (App. at 50.).

The IRS moved to dismiss the Debtors' adversary complaint on February 14, 2011, contending that the Bankruptcy Court lacked jurisdiction and that the Debtors failed to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (incorporated by Federal Rule of Bankruptcy Procedure 7012(b)). More particularly, the IRS argued that the Bankruptcy Court lacked jurisdiction under Code § 505(a)(1) because the Debtors had not alleged that MSC II had actually paid any federal corporate income taxes or filed any federal income tax returns prior to initiating their

---

possible taxable nature of the conversion to an LLC when it occurred.

13

adversary proceeding, so that their claims were not ripe. The IRS also argued that the Debtors had failed to state a claim because MSC II's status as a QSub was not "property" of the MSC II estate because MSC II "never had a right to claim, continue, or revoke" that status "either before or after it filed its bankruptcy petition" (App. at 81), and that no "transfer" of estate property occurred when BDI terminated its S-corp election and triggered the loss of MSC II's QSub status, (App. at 83-84).

Barden and BDI answered the Debtors' adversary complaint on February 28, 2011, and moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). They contended that because a QSub has no separate tax existence, MSC II had no cognizable property interest in that status. They also argued that, because a subsidiary's QSub status depends entirely on elections made by its S-corp parent, even if MSC II's QSub status were a species of property, it was property that belonged to BDI and Barden.

The Debtors moved for summary judgment on March 16, 2011, and, on January 24, 2012, the Bankruptcy Court granted their motion and denied both the IRS's motion to dismiss and the Barden Appellants' motion for judgment on the pleadings. The Court held that MSC II's status as a QSub was the property of MSC II, and that, as such, it belonged to MSC II's bankruptcy estate. The Court therefore concluded that the revocation by non-debtor BDI of its status as an S-corp, and the resulting termination of MSC II's status as a QSub, were void and of no effect. Finally, the Court ordered the defendants, including the IRS, to take all actions necessary to restore the status of MSC II as a QSub of BDI.

14

That order, of course, has significant practical implications for the parties. As with many bankruptcy reorganizations, the Debtors' emergence from bankruptcy resulted in the cancellation of a substantial amount of indebtedness, which, in turn, generated "cancellation of debt" ("COD") income equal to the amount by which the debt was reduced in bankruptcy. At oral argument before us, the IRS said that the amount of that COD income was $170 million. COD income is generally subject to federal taxation. *See* I.R.C. § 61(a)(12) (including in the definition of "gross income" "income from the discharge of indebtedness"). If BDI is restored to S-corp status, then it, and ultimately Barden, is the taxpayer and would be liable for the taxes on the COD income. *See* Prop. Treas. Reg. § 1.108-9, 76 Fed. Reg. 20593-01 (Apr. 13, 2011) (providing that, when the debtor is a disregarded entity, such as an S-corp, then the owner of that entity is the taxpayer). Normally, under the so-called "Bankruptcy Exception," a taxpayer in bankruptcy does not recognize COD income on debt that is cancelled or written down as part of a plan of reorganization. I.R.C. § 108(a)(1)(A). However, in this case, neither Barden nor BDI was part of the Majestic bankruptcy, so they may not qualify for the Bankruptcy Exception and could be liable for the tax on the COD income. *See* Prop. Treas. Reg. § 1.108-9 (limiting the Bankruptcy Exception to entities under the jurisdiction of the Bankruptcy Court). Also, the Bankruptcy Court's order caused the IRS to lose the benefit of MSC II's tax liabilities being treated as an administrative expense of the bankruptcy estate, which would have allowed the government to be paid before most other creditors. *See* 11 U.S.C. § 503(b)(1)(B).

15

By contrast, the Debtors – or, more precisely, their former creditors who replaced BDI as the holders of MSC II's equity – benefit in at least two dramatic ways if the Revocation is deemed to have been void or is otherwise avoided. First, if MSC II remains a QSub even after having emerged from bankruptcy, then it (and its new equity holders) will continue to enjoy its tax-free status, while BDI retains liability for MSC II's income taxes, even though BDI no longer has access to MSC II's income and cash flow to fund the tax payments. Second, by shifting the tax liability for COD income to BDI, MSC II need not make use of the Bankruptcy Exception, which would ordinarily come with a substantial cost. Under the I.R.C., a debtor that makes use of the Bankruptcy Exception must reduce the value of other tax attributes dollar-for-dollar by the amount of COD income excluded from gross income. *See* I.R.C. § 108(b)(1). That means that the reorganized debtor loses the value of various deductions and credits that would have been available to reduce taxes in the future. *See id.* § 108(b)(2). As a consequence of the Bankruptcy Court's order, however, the Debtors avoid liability for COD income without the adverse impact on their tax attributes.

The Bankruptcy Court granted the IRS and the Barden Appellants leave to appeal on March 7, 2012, even though the Court's judgment and order had left open the calculation of the damages for which Barden and BDI were liable as a result of the Court's conclusion that they had violated the automatic stay. The United States District Court for the District of Delaware certified the appeals to us on May 23, 2012, and we authorized the appeals on July 9, 2012.

## II.   JURISDICTION AND STANDARDS OF REVIEW

16

The Bankruptcy Court had jurisdiction over the adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(2), 1334(a)-(b). We have jurisdiction over this direct appeal under 28 U.S.C. § 158(d)(2)(A). We reject the Barden Appellants' argument, raised for the first time in this appeal, that the Bankruptcy Court, as an Article I court, lacked jurisdiction to order the IRS to reinstate BDI's status as an S-corp and MSC II's status as a QSub. Leaving aside that arguments not raised below are normally waived on appeal, *see In re American Biomaterials Corp.*, 954 F.2d 919, 927 (3d Cir. 1992), that argument is without merit. The Bankruptcy Code gives bankruptcy courts the power to "'issue any order, process, or judgment that is necessary or appropriate to carry out [its] provisions.'" *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 567 (3d Cir. 2003) (quoting 11 U.S.C. § 105(a)). The IRS is subject to that power as an "entity" referred to in specific provisions of the Code, because that term expressly includes a "governmental unit." 11 U.S.C. § 101(15). The Court's ability to exercise jurisdiction over the IRS has been affirmed in a number of contexts. *See United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990) (holding that "a bankruptcy court has the authority to order the IRS to apply the payments [made by a debtor] to trust fund liabilities if the bankruptcy court determines that this designation is necessary to the success of a reorganization plan"); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 209 (1983) (concluding that the Code authorizes a bankruptcy court to recover property seized to satisfy a lien prior to the filing of a petition for reorganization, and noting that "[w]e see no reason why a different result should obtain when the IRS is the creditor").

Transactions to which the IRS is a party are also subject to the general rule that they are void if they violate the automatic stay. *See United States v. Galletti*, 541 U.S. 114, 124 n.5 (2004) (noting that the automatic stay barred the IRS from bringing suit against a debtor in bankruptcy); *In re Schwartz*, 954 F.2d 569, 571 (9th Cir. 1992) (holding that an IRS tax assessment that violated the automatic stay was void).

Although we reject the Barden Appellants' argument that the Bankruptcy Court lacked jurisdiction, we note that this case raises a jurisdictional question of standing that the parties did not raise and the Bankruptcy Court did not consider. We address that question in Parts III.A and III.B, *infra*, in the context of the merits.

When reviewing a bankruptcy court's grant of summary judgment, "we review the ... findings of fact for clear error and exercise plenary review over the ... legal determinations." *In re Kiwi Int'l Air Lines, Inc.*, 344 F.3d 311, 316 (3d Cir. 2003) (citing *In re Woskob*, 305 F.3d 177, 181 (3d Cir. 2002); *In re Cont'l Airlines*, 125 F.3d 120, 128 (3d Cir. 1992)). A grant of summary judgment is "proper only if it appears that there is no genuine issue as to any material fact and that [each of] the moving part[ies] is entitled to a judgment as a matter of law." *Id.* (alterations in original) (quoting Fed. R. Civ. P. 56(c)) (internal quotation marks omitted). In evaluating the evidence, we "view inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." *Bartnicki v. Vopper,* 200 F.3d 109, 114 (3d Cir. 1999).

We exercise plenary review over rulings on motions to dismiss, *In re Avandia Mktg., Sales Practices & Prods. Liab.*

18

*Litig.*, 685 F.3d 353, 357 (3d Cir. 2012), and over rulings on motions for judgments on the pleadings, *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008).

## III.   DISCUSSION

This appeal requires us to answer two related questions. As a threshold matter of justiciability, we must decide whether the Debtors have standing to challenge the revocation of MSC II's QSub status. That, however, requires us to address the merits of whether the MSC II bankruptcy estate had a property interest in MSC II's QSub status such that the Debtors had the right to challenge what they characterize as the postpetition transfer of that interest.

### A.   *Standing*

Front and center in this case is the question of whether a debtor subsidiary's entity tax status is "property" at all, and, if so, whether it is property belonging to that subsidiary or to its non-debtor corporate parent. That implicates standing, even though the issue was not addressed before this appeal. Inasmuch as the "[s]tanding doctrine embraces ... judicially self-imposed limits on the exercise of federal jurisdiction," *Allen v. Wright*, 468 U.S. 737, 751 (1984), we turn to it first.

The doctrine of standing "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 484 (1982) (quoting *Flast v. Cohen*, 392 U.S. 83, 99 (1968)) (internal quotation marks omitted). It "involves both constitutional limitations on federal-court

19

jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). One of those prudential limits demands that "the plaintiff generally ... assert his own legal rights and interests, and []not rest his claim to relief on the legal rights or interests of third parties." *Id.* at 499.

The Debtors' effort to pursue claims under Code §§ 362, 549, and 550 is dependent upon Code § 541, which provides that a bankruptcy estate succeeds only to "legal or equitable interests of the debtor ... as of the commencement of the case." 11 U.S.C. § 541(a)(1). It is a given that "[t]he trustee [or debtor-in-possession] can assert no greater rights than the debtor himself had on the date the [bankruptcy] case was commenced." *Guinn v. Lines* (*In re Trans-Lines West, Inc.*), 203 B.R. 653, 660 (Bankr. E.D. Tenn. 1996) (quoting 4 Collier on Bankruptcy ¶ 541.06 (15th ed. 1996)) (internal quotation marks omitted).

As discussed in more detail in Part III.B.1, *infra*, "a corporation cannot alter its tax status through election, revocation or rescission, without some form of shareholder consent," so that "the corporation, standing alone, cannot challenge the validity of a prior Subchapter S revocation ... without the consent of at least those shareholders who consented to the revocation." *Trans-Lines West*, 203 B.R. at 660. As a result, "[a] trustee [or debtor-in-possession] who attempts to challenge the validity of a revocation without such consent is asserting the rights of a third party," i.e., the equity holder, and "does not have standing ... ." *Id.*; *cf. Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976) (declining to decide "whether a third party ever may challenge IRS treatment of another").

Following that reasoning, if we assume that a subsidiary's entity tax status, e.g., its existence as a pass-though entity, is "property" but hold that such status belongs not to the subsidiary itself but rather to its parent, then the right to challenge the revocation of QSub status belongs solely to the parent corporation, and the bankruptcy estate of a QSub does not succeed to that right under Code § 541. If that is the case, then a debtor subsidiary that challenges a revocation, as MSC II has done in this case, is endeavoring to assert the rights of a third party, namely its S-corp parent, which is contrary to general principles of standing.

The prohibition on third party standing, however, "is not invariable and our jurisprudence recognizes third-party standing under certain circumstances." *Pa. Psychiatric Soc'y v. Green Spring Health Servs. Inc.*, 280 F.3d 278, 288 (3d Cir. 2002). We have recognized that "the principles

21

animating ... prudential [standing] concerns are not subverted if the third party is hindered from asserting its own rights and shares an identity of interests with the plaintiff." *Id.* (citing *Craig v. Boren*, 429 U.S. 190, 193-94 (1976); *Singleton v. Wulff*, 428 U.S. 106, 114-15 (1976) (plurality opinion); *Eisenstadt v. Baird*, 405 U.S. 438, 443-46 (1972)). "More specifically, third-party standing requires the satisfaction of three preconditions: 1) the plaintiff must suffer injury; 2) the plaintiff and the third party must have a 'close relationship'; and 3) the third party must face some obstacles that prevent it from pursuing its own claims." *Id.* at 288-89 (citing *Campbell v. Louisiana,* 523 U.S. 392, 397 (1998); *Powers v. Ohio*, 499 U.S. 400, 411 (1991); *Pitt. News v. Fisher*, 215 F.3d 354, 362 (3d Cir. 2000)).

If the entity tax status of MSC II is "property" that belongs to BDI, then the present case does not satisfy the third condition for third-party standing. Nothing in the record suggests that BDI, as the former shareholder of MSC II and the "third party" with standing, is unable to protect its own interests. The term "third party" is actually something of a misnomer here because BDI, as well as its ultimate shareholder Barden, are both defendant parties in the present action and have vigorously fought to protect their interests. Sticking with that nomenclature, though, it is settled that "third parties themselves usually will be the best proponents of their own rights," *Singleton*, 428 U.S. at 114, and the fact that BDI chose not to backtrack and challenge the Revocation does not mean that MSC II or the Debtors have standing to do so.

We thus find ourselves in a circumstance where what is ordinarily the preliminary question of standing cannot be

answered without delving into whether the entity tax status of MSC II is "property" and, if so, whether it belongs to MSC II. In short, we must consider the merits.

### B. *QSub Status Claimed as "Property" of the MSC II Bankruptcy Estate*

Referring to MSC II's QSub status, the Bankruptcy Court said that "because the debtor-corporation's subchapter 'S' status provided the debtor-corporation the ability to pass-through capital gains tax liabilities to its principals, the right to make or revoke its subchapter 'S' status had value to the debtor and constituted property or an interest of the debtor in property." *In re Majestic Star Casino, LLC*, 466 B.R. 666, 675 (Bankr. D. Del. 2012). The Barden Appellants argue that the Bankruptcy Court erred in that conclusion because the Court "applied a general overarching bankruptcy principle that anything that brings value into a bankruptcy estate must be a property right" (Barden Appellants' Opening Br. at 21), despite the fact that "the Bankruptcy Code by itself ... does not constitute a source of property rights" (*id.* at 18). Likewise, the IRS asserts that simply because an S-corp election "means that the corporation may 'use' and 'enjoy'" the benefits of a pass-through entity tax status, "it does not follow that the postpetition revocation of ... [that] election is a transfer of estate property." (IRS Opening Br. at 27.)

In their adversary proceeding, the Debtors sought relief under §§ 549, 550, and 362 of the Code.[11] Section 549

---

[11] Specifically, the Debtors sought "an order voiding the Avoidable Transfer under section 549 of the Bankruptcy Code, and[,] pursuant to section 550 of the ... Code," orders

23

provides that a debtor-in-possession or trustee "may avoid a transfer of property of the estate that occurs after the commencement of the case[] and that is not authorized ... by the court." 11 U.S.C. § 549(a). Section 550 permits the debtor-in-possession or trustee to "recover, for the benefit of the estate" property whose transfer has been avoided under § 549. *Id.* § 550(a). Finally, § 362 provides for an "automatic stay" such that the filing of a chapter 11 petition "operates as a stay, applicable to all entities," of, *inter alia*, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." *Id.* § 362(a)(3). Section 362 also provides that "an individual injured by any willful violation of [the] stay ... shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." *Id.* § 362(k)(1).

Section 362 operates differently than §§ 549 and 550. Those latter sections authorize the bankruptcy court to "avoid" the violative transfer, but the debtor-in-possession or trustee must commence an adversary proceeding. *See* Fed. R. Bankr. P. 7001(1) (requiring that a "proceeding to recover money or property" be brought as an "adversary proceeding"); *In re Doll & Doll Motor Co*., 448 B.R. 107, 111 (Bankr. M.D. Ga. 2011) (denying bank's motion seeking

directing all of the defendants to return any transferred property and directing the IRS and Indiana Department of Revenue to return any tax payments made by MSC II as a result of the Avoidable Transfer, an order invalidating the Revocation, and an order "voiding the Avoidable Transfer under section 362(a)(3) ... and section 362(k)(1) of the Bankruptcy Code ... ." (App. at 51.)

24

an order to recover property sold by a Chapter 11 debtor because the bank had not filed an adversary proceeding against the buyer). By contrast, a transfer that violates the automatic stay is generally considered to be void without any action on the part of the debtor. *In re Myers*, 491 F.3d 120, 127 (3d Cir. 2007) (citing *In re Siciliano*, 13 F.3d 748, 750 (3d Cir. 1994) ("[T]he general principle [is] that any creditor action taken in violation of an automatic stay is void *ab initio*.")).

Notwithstanding that difference, all three sections have three elements in common for purposes of the problem before us. For the Revocation to be void under § 362 or avoidable under §§ 549 and 550, QSub status must be (1) "property" (2) "of the bankruptcy estate" (3) that has been "transferred." Though a lack of any one of those elements is dispositive, we choose to consider – in the alternative – only the first two.

### 1. *QSub Status as "Property"*

Section 541(a) of the Bankruptcy Code defines "property of the estate" as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "[W]e have emphasized that Section 541(a) was intended to sweep broadly to include all kinds of property, including tangible or intangible property, [and] causes of action[.]" *In re Kane*, 628 F.3d 631, 637 (3d Cir. 2010) (second alteration in original) (quoting *Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 241 (3d Cir. 2001)) (internal quotation marks omitted). "[T]he term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed." *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 211 (3d Cir. 2006) (quoting *Segal v. Rochelle*, 382 U.S. 375, 379 (1966)) (internal quotation marks omitted). "It is also well established that the mere opportunity to receive an economic benefit in the future is property with value under the Bankruptcy Code." *Id.* (internal quotation marks omitted).

However, "[f]iling for bankruptcy does not create new property rights or value where there previously were none." *In re Messina*, 687 F.3d 74, 82 (3d Cir. 2012); *cf. Butner v. United States*, 440 U.S. 48, 56 (1979) (noting that the holder of a property interest "is afforded in federal bankruptcy court the same protection he would have had under state law if no bankruptcy had ensued"). Consequently, "[t]he estate is determined at the time of the initial filing of the bankruptcy petition ... ." *Kollar v. Miller*, 176 F.3d 175, 178 (3d Cir. 1999).

This appears to be a matter of deliberate Congressional choice. Although the constitutional authority of Congress to establish "uniform Laws on the subject of Bankruptcies throughout the United States," U.S. Const., art. I, § 8, cl. 4, could, in theory, encompass a statutory framework defining property interests for purposes of bankruptcy, "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law," *Butner*, 440 U.S. at 54; *see also In re Brannon*, 476 F.3d 170, 176 (3d Cir. 2007) ("[W]e generally turn to state law for the determination of property rights in the assets of a bankrupt's estate." (internal quotation marks omitted)). However, if "some federal interest requires a different result," *Butner*, 440 U.S. at 55, then property interests may be defined by federal law. *Cf. McKenzie v. Irving Trust Co.*, 323 U.S. 365, 370 (1945) (noting that, "[i]n the absence of any controlling federal statute," a creditor may acquire rights to property transferred by a debtor "only by virtue of state law").

Given the importance of federal tax revenues, one might assume that the Internal Revenue Code determines whether tax status constitutes a property interest of the taxpayer, but it does not do so explicitly and the case law is not entirely clear. *See Drye v. United States*, 528 U.S. 49, 57 (1999) (considering whether "state law is the proper guide to ... 'property' or 'rights to property'" under a provision of the I.R.C. and noting that the Court's "decisions in point have not been phrased so meticulously"). On one hand, the I.R.C. "creates no property rights but merely attaches consequences, federally defined, to rights created under state law." *United States v. Bess*, 357 U.S. 51, 55 (1958). Thus, "[i]n the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer

27

had in the property." *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 722 (1985) (quoting *Aquilino v. United States*, 363 U.S. 509, 513 (1960)) (internal quotation marks omitted). On the other hand, "[o]nce it has been determined that state law creates sufficient interests in the [taxpayer] to satisfy the requirements of [the federal revenue statute], state law is inoperative, and the tax consequences thenceforth are dictated by federal law." *Id.* (second alteration in original) (quoting *Bess*, 357 U.S. at 56-57) (internal quotation marks omitted). In *Drye v. United States*, the Supreme Court ultimately concluded that "the [I.R.C.] and interpretive case law place under federal, not state, control the ultimate issue whether a taxpayer has a beneficial interest in any property subject to levy for unpaid federal taxes." 528 U.S. at 57. Also, the I.R.C. does address the handling of tax attributes in the bankruptcy context, at least when "the debtor is an individual," *see* I.R.C. § 1398(a), and provides that the "[e]state succeeds to tax attributes of [the] debtor ... determined as of the first day of the debtor's taxable year in which the case commences ... ." I.R.C. § 1398(g); *see also United States v. Sims* (*In re Feiler*), 218 F.3d 948, 953 (9th Cir. 2000) ("I.R.C. § 1398 determines what tax attributes of the debtor rightfully belong to the bankruptcy estate ... ."). The Bankruptcy Code itself defers to the I.R.C. with respect to the creation and character of certain tax attributes of the bankruptcy estate. *See* 11 U.S.C. § 346(a) (providing that the I.R.C. governs whether the creation of a bankruptcy estate creates a tax entity separate from the debtor). Thus, we conclude that the I.R.C., rather than state law, governs the characterization of entity tax status as a property interest for purposes of the Bankruptcy Code.

28

With this background, we review the case law that the Debtors say supports their claim that MSC II's QSub status was "property."

### i.      S-Corp Status as "Property"

The Bankruptcy Court reasoned that QSub status is analogous to S-corp status and, based on a few cases holding that the latter is "property" for purposes of the Code, concluded that the former is "property" too. The principal case is *In re Trans-Lines West, Inc.*, 203 B.R. 653 (Bankr. E.D. Tenn. 1996), which concerned whether a corporation's revocation of its S-corp status prior to filing for bankruptcy was a prepetition transfer of property avoidable by the trustee pursuant to Code § 548.[12] The bankruptcy court in that case acknowledged that, "[i]n the absence of controlling federal law, the question of whether a debtor possesses an interest in property is governed by state law," but the court reasoned that, "[b]ecause the subject of the alleged transfer is the Debtor's status as a Subchapter S corporation, a status created under title 26 of the United States Code, ... federal law, and more specifically the Internal Revenue Code," determines whether a debtor holds a property interest in its S-corp status. 203 B.R. at 661.[13] The court observed that "'property' refers

---

[12] Section 548 provides, in relevant part, that "the trustee may avoid any transfer ... of an interest of the debtor in property, or any obligation ... incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition ... ." 11 U.S.C. § 548(a)(1).

[13] Courts that have followed *Trans-Lines West* have reached the same conclusion. *See, e.g.*, *Parker v. Saunders* (*In re Bakersfield Westar, Inc.*), 226 B.R. 227, 233 (B.A.P. 9th

... to the right and interest or domination rightfully obtained over [an] object, with the unrestricted right to its use, enjoyment, and disposition." *Id.* (quoting 63A Am. Jur. 2d *Property* §1 (1984)) (internal quotation marks omitted). It then jumped to the conclusion that,

> once a corporation elects to be treated as an S corporation, I.R.C. § 1362(c) guarantees and protects the corporation's right to use and enjoy that status until it is terminated under I.R.C. § 1362(d). Moreover, § 1362(d)(1)(A) provides that "[a]n election under subsection (a) may be terminated by revocation." I.R.C. § 1362(d)(1)(A) ... . Thus, I.R.C. § 1362(d)(1)(A) guarantees and protects an S corporation's right to dispose of that status at will.

*Id.* (first alteration in original).

The court also noted that I.R.C. § 1362(c) provides that an S-corp election "shall be effective ... for all succeeding taxable years of the corporation, until such election is terminated," *id.* at 661-62 (internal quotation marks omitted), and it reasoned that the I.R.C. thus "affords a corporation which has elected the Subchapter S status a guaranteed, indefinite right to use, enjoy, and dispose of that status," *id.* at 661. From that, the court concluded that "the Debtor possessed a property interest (i.e., a guaranteed right to use, enjoy and dispose of that interest) in its Subchapter S status ...

---

Cir. 1998) ("[A] debtor's subchapter S status is a creation of I.R.C. § 1362, and federal law therefore determines whether a debtor holds a 'property' interest in its subchapter S status.").

." *Id.* at 662. Other courts that have considered the issue of S-corp status as a property right have all come to the same conclusion. *See Halverson v. Funaro* (*In re Funaro*), 263 B.R. 892, 898 (B.A.P. 8th Cir. 2001) ("[A] corporation's right to use, benefit from, or revoke its Subchapter S status falls within the broad definition of property [under the Code]."); *Parker v. Saunders* (*In re Bakersfield Westar, Inc.*), 226 B.R. 227, 234 (B.A.P. 9th Cir. 1998) (concluding that the holding in *Trans-Lines West* "is consistent with the Ninth Circuit's definition of property"); *Hanrahan v. Walterman* (*In re Walterman Implement Inc.*), Bankr. No. 05-07284, 2006 WL 1562401, at *4 (Bankr. N.D. Iowa May 22, 2006) ("[T]he right to revoke [a] Subchapter S election is property ... as defined in § 541[] ... [and] the revocation of Debtor's subchapter S status is also voidable under § 549 as a postpetition transfer.").

The *Trans-Lines West* decision and those that follow it base their conclusion that S-corp status is "property" on a series of precedents holding net operating losses ("NOLs") to be property.[14] In *Segal v. Rochelle*, the Supreme Court

---

[14] Net operating losses

are created when the taxpayer's deductible business expenses for a given year exceed her net income for that year. [I.R.C.] § 172(c). Once NOLs are sustained, the taxpayer may carry the loss back three years and use it as a deduction in that year. NOLs that remain are applied to the next two years and deducted accordingly. *Id.* § 172(b)(1)(A), (b)(2). If any loss remains at the end of the three-year carryback period, it is carried forward and deducted from the

declared that the right to offset NOLs against past income (a "loss carryback") is property of an individual debtor, because it entitles the debtor to a refund of taxes already paid. 382 U.S. at 380-81. The Court decided that a debtor's NOLs, because they arise from prior losses, are "sufficiently rooted in [its] pre-bankruptcy past" that, when carried back to generate a tax refund, they "should be regarded as 'property' under [the Code]." *Id.* at 380.

Subsequent cases extended the holding in *Segal* to the right to use NOLs to offset future tax liability (a "loss carryforward"). For example, in *Official Committee of Unsecured Creditors v. PSS Steamship Co.* (*In re Prudential Lines, Inc.*), 928 F.2d 565, 567 (2d Cir. 1991),[15] a corporate

> taxpayer's income over the next fifteen years (or until it is exhausted), beginning with the year after the loss was initially sustained. *Id.* § 172(b)(1)(B). Alternatively, the Tax Code permits the taxpayer to forego the carryback option and instead use the NOLs exclusively in future years. *Id.* § 172(b)(3)(C). Such an election, once made, is irrevocable for that tax year. *Id.*

*Gibson v. United States* (*In re Russell*), 927 F.2d 413, 415 (8th Cir. 1991). An NOL "carryback" against past earnings therefore generates a claim for a refund of taxes paid on those earnings, while an NOL "carryforward" represents the ability to shelter future income from taxation.

[15] Although *Prudential Lines* and cases that followed it extended *Segal*'s holding, the *Segal* Court expressly reserved judgment on whether future tax benefits, such as loss

subsidiary had $74 million of NOLs attributable to its past operations when an involuntary petition for reorganization under Chapter 11 was filed against it. Its corporate parent attempted to take a $39 million "worthless stock" deduction, based on the anticipated loss of its investment in the subsidiary, which would have eliminated the value of its NOL for future use, but creditors of the subsidiary sued the parent

---

"carryforwards" (or "carryovers") would also constitute bankruptcy estate property. The Court observed that "a carryover into post-bankruptcy years can be distinguished both conceptually as well as practically" from a benefit available against past taxes because "the supposed loss-carryover would still need to be matched in some future year by earnings, earnings that might never eventuate at all." *Segal*, 382 U.S. at 381. Despite that *dictum*, the court in *Prudential Lines* concluded that "[t]he fact that the right to a[n] NOL carryforward is intangible and has not yet been reduced to a tax refund ... does not exclude it from the definition of property of the estate." 928 F.2d at 572. That conclusion relied on the *Segal* Court's reasoning that "postponed enjoyment does not disqualify an interest as 'property,'" and that "contingency in the abstract is no bar" to finding that an interest is property of a bankruptcy estate. 382 U.S. at 380. But that reasoning in *Segal* was addressed only to the argument that an NOL carryback was not property of the estate at the commencement of the proceeding because "no refund could be claimed from the Government until the end of the year" of filing, during which "earnings by the bankrupt ... might diminish or eliminate the loss-carryback refund claim ... ." *Id.* It does not support the broad proposition that any contingent tax attribute can necessarily be labeled as "property."

to enjoin it from doing so. The bankruptcy court held that the NOL carryforward was property of the subsidiary's bankruptcy estate and that the parent's planned tax deduction would violate the automatic stay. The court thus granted the injunction. *In re Prudential Lines Inc.*, 114 B.R. 27, 32 (Bankr. S.D.N.Y. 1989). The United States Court of Appeals for the Second Circuit affirmed, holding that the "right to carryforward [the] $74 million NOL to offset future income is property of the [subsidiary's] estate within the meaning of § 541." 928 F.2d at 571. *Accord In re Feiler*, 218 F.3d at 955-56 (holding that a prepetition election to carry forward NOLs, making them unavailable to the debtor to claim a refund of past taxes, constituted a preference payment avoidable under the Code); *Gibson v. United States* (*In re Russell*), 927 F.2d 413, 417-18 (8th Cir. 1991) (same). The Second Circuit also held that the non-debtor parent's proposed worthless stock deduction was barred by the automatic stay because, "where a non-debtor's action with respect to an interest that is intertwined with that of a bankrupt debtor would have the legal effect of diminishing or eliminating property of the bankrupt estate, such action is barred by the automatic stay." *Prudential Lines*, 928 F.2d at 574.[16]

---

[16] We have not yet addressed the question of whether NOL carrybacks or carryforwards constitute property. The closest we have come to deciding the question was an issue arising under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, rather than the I.R.C. In *In re Fruehauf Trailer Corp.*, 444 F.3d 203 (3d Cir. 2006), a debtor made an irrevocable election to increase pension benefits that denied the bankruptcy estate the ability to recoup an accumulated surplus in plan assets. We held that

*Trans-Lines West* and the decisions that follow it extended *Prudential Lines*, saying that the ability to make an S-corp election, like the ability to elect whether to carry forward or carry back NOLs, is property. We think that extension untenable, though, for several reasons.[17] First, in

"[t]his recoupment right is a transferable property interest" because,"[a]lthough the right to recover [the surplus from an ERISA-qualified retirement plan] is a future estate, the reversion itself is a present, vested estate. As a result, the employer's reversionary interest falls within the broad reach of section 541(a) of the Bankruptcy Code and is considered property ... ." *Id.* at 211 (second alteration in original) (internal quotation marks omitted); *see also id.* ("Property of the estate includes all interests, such as ... contingent interests and future interests, whether or not transferable by the debtor." (quoting *Prudential Lines*, 928 F.2d at 572) (internal quotation marks omitted)).

[17] We are not the only ones to find the *Trans-Lines West* line of cases wanting. *See* James S. Eustice & Joel D. Kuntz, Federal Income Taxation of S Corporations ¶ 5.08[1] (4th ed. 2001) ("These cases seem like little more than hard bankruptcy cases making bad tax law."); Camilla Berit Galesi, *Shareholders' Rights Regarding Termination of a Debtor Corporation's S Status in a Bankruptcy Setting*, 10 J. Bankr. L. & Prac. 157, 161-62 (2001) ("[D]ue to the [*Trans-Lines West*] court's misunderstanding of the rules governing S election and termination[] ... the court adopts an erroneous conception of the nature of a corporation's interest in its S status."); Richard A. Shaw, *Taxing Shareholders on the Income of an S Corporation in Bankruptcy*, 1 No. 6 Bus. Entities 40, 1999 WL 1419055, at *46 (1999) ("In its haste to provide cash for creditors, the Ninth Circuit BAP in

applying the NOL-as-property principle, which had been extended once already by *Prudential Lines*, *see supra* note 15, the decision in *Trans-Lines West* and the other S-corp-as-property cases fail to consider important differences between the two putative property interests.[18] In holding that tax status is property, the S-corp cases reason from the premise

---

*Bakersfield* [*Westar*] and the Tennessee Bankruptcy Court in ... *Trans-Lines West* ... are simply creating a windfall for the bankruptcy estate at the expense of third parties who are not in the bankruptcy proceeding."); *id.* ("The NOL cases are somewhat easier to accept ... [but] [t]he case for disrespecting the revocation of an S election is, in many ways, much more troublesome.").

[18] The reasoning of the "NOL-as-property" cases is itself not without flaws. Those cases looked, in part, to Congressional intent that "property of the estate" be construed to "include[] all interests, such as ... contingent and future interests." *Prudential Lines*, 928 F.2d at 572 (quoting H.R. Rep. No. 95-595, at 176 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6136) (internal quotation marks omitted); *see also Feiler*, 218 F.3d at 956-57 (quoting same and suggesting that "Congress affirmatively adopted the *Segal* holding when it enacted the present Bankruptcy Code"). But Code § 541 contains no reference to "contingent" or "future" interests and refers only to "legal or equitable interests of the debtor in property *as of the commencement of the case*." 11 U.S.C. § 541(a)(1) (emphasis added). Moreover, "the crucial analytical key [is] not ... an abstract articulation of the statute's purpose, but ... an analysis of the nature of the asset involved in light of those principles." *Kokoszka v. Belford*, 417 U.S. 642, 646 (1974).

that the "prospective ... nature [of a right] does not place it outside the definition of 'property.'" *Bakersfield Westar*, 226 B.R. at 234. Even accepting that this will sometimes be the case, not all contingencies are of equal magnitude or consequence. NOLs when carried back are hardly contingent at all. In all events, a debtor in possession of NOLs has a defined amount of them at the time of the bankruptcy filing; they are a function of the debtor's operations prior to bankruptcy and are not subject either to revocation by the shareholders or termination by the IRS. *See Segal*, 382 U.S. at 381 (noting that "[t]he bankrupts in this case had both prior net income and a[n] [NOL] when their petitions were filed"); *Prudential Lines*, 928 F.2d at 571 (noting that the subsidiary had "a $74 million NOL attributable to its pre-bankruptcy operation" when it filed for Chapter 11 reorganization). By contrast, the shareholders of an S-corp can terminate its pass-through status at will, regardless of how long it has been an S-corp and whatever its pre-bankruptcy operating history has been. The tax status of the entity is entirely contingent on the will of the shareholders.

NOLs also have value in a way that S-corp status does not. The value of an NOL is readily determinable as a tax refund immediately available to the bankruptcy estate to the extent that it is applied to prior years' earnings, and it is still subject to relatively clear estimation if the debtor decides to carry it forward against future earnings. The value of the S-corp election, however, is dependent on its not being revoked, as well as the amount and timing of future earnings. Moreover, NOL carryforwards may be monetized in a manner that continuing S-corp status cannot. A corporation that does not expect to generate sufficient future earnings to use its NOLs may be purchased by another more profitable

37

corporation which may then use the NOLs to shelter its own income, a transaction expressly contemplated by the I.R.C. *See* I.R.C. § 382 (setting forth certain limitations on the use of NOL carryforwards after a change in the corporation's ownership). By contrast, the sale of an S-corp will generally result in the termination of its tax-free status. *See* I.R.C. § 1361(b)(1) (setting forth the requirements for "small business corporation" status and providing that the sale of an S-corp to most corporate purchasers would terminate its "S" status). Thus, the analogy of S-corp status to NOLs is of limited validity.

A further flaw in the S-corp-as-property cases is that they presume that "once a corporation elects to be treated as an S corporation, [the I.R.C.] guarantees and protects the corporation's right to use and enjoy that status ... [and] guarantees and protects an S corporation's right to dispose of that status at will."[19] *Trans-Lines West*, 203 B.R. at 662. That reflects an incomplete and inaccurate understanding of the law. The I.R.C. does not, and cannot, guarantee a corporation's right to S-corp status, because the corporation's shareholders may elect to revoke that status "at will." *See* I.R.C. § 1362(d)(1)(B) (providing for termination of S-corp status by revocation with the approval of shareholders holding more than one-half the corporation's shares). Even if the shareholders do not vote to revoke their corporation's S-corp status, any individual shareholder may at any time sell his interest – without hindrance by the Code or the I.R.C. – to another corporation, or to a nonresident alien, or to a number

---

[19] To speak of the revocation as a "disposition," as *Trans-Lines West* does, is to assume that the tax status is a property interest, which is exactly the issue in contention.

of new individuals sufficient to increase the total number of shareholders to more than 100.[20] Any of those sales would trigger the automatic revocation of the company's S status because the corporation would no longer qualify as a "small business corporation." *See* I.R.C. § 1361(a)(1), (b)(1). Thus, the *Trans-Line West* line of cases is incorrect in concluding that S-corp status is a "right" that is "guaranteed" under the I.R.C.[21]

---

[20] There may, of course, be contractual agreements among the shareholders limiting the alienability of shares.

[21] Our holding in *Fruehauf Trailer*, *see supra* note 16, is not to the contrary. In that case, we held that a corporate debtor's right to recoup an accumulated surplus in its pension plan was property, even though the plan trustee had the right to make an irrevocable election under ERISA to increase pension benefits, denying the debtor the benefit of that surplus. *See* 444 F.3d at 211 (noting that property may be "contingent" and that "the mere opportunity to receive an economic benefit in the future is property with value under the Bankruptcy Code" (internal quotation marks omitted)). But in that case the debtor had a contractual right to recover the surplus, which we found to be a "future estate, [in which] the reversion itself is a present, vested estate," and one that was "transferable and alienable." *Id.* As a result, we held that the debtor's "reversionary interest falls within the broad reach of section 541(a) of the Bankruptcy Code and is considered property of the debtor's estate." *Id.* An S-corp has no such contractual or otherwise "reversionary" interest in its tax status, let alone one that is "transferable and alienable."

Perhaps recognizing those flaws, some courts holding that S-corp status is "property" have defaulted to the argument that such status must be property because it has value to the estate. *See Prudential Lines*, 928 F.2d at 573 ("[W]e must consider the purposes animating the Bankruptcy Code ... [and] Congress' intention to bring anything of value that the debtors have into the estate." (internal quotation marks omitted)); *Bakersfield Westar*, 226 B.R. at 234 ("The ability to not pay taxes has a value to the debtor-corporation in this case."). Indeed, the Bankruptcy Court in this case essentially defined the Debtors' property interest as "the right to prevent a shifting of tax liability from the shareholders to the QSub through a revocation of the 'S' corporation's status." *Majestic Star Casino*, 466 B.R. at 678. But § 541 defines property only in terms of "legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). It goes without saying that the "right" of a debtor to place its tax liabilities on a non-debtor may turn out to have some value, but that does not mean that such a right, if it exists, is property. Capacious as the definition of "property" may be in the bankruptcy context, we are convinced that it does not extend so far as to override rights statutorily granted to shareholders to control the tax status of the entity they own. "[T]he Code's property definition is not without limitations ... ." *Westmoreland*, 246 F.3d at 256. Even accepting that an interest that is "novel or contingent" may still represent property under the Code, *Segal*, 382 U.S. at 379, a tax classification over which the debtor has no control is not a "legal or equitable interest[] of the debtor in property" for purposes of § 541.

Finally, aside from their flawed reasoning, *Trans-Lines West* and its progeny (and the Bankruptcy Court's decision in

this case) also produce substantial inequities. Taxes are typically borne and paid by those who derive some benefit from the income. *Cf.* I.R.C. § 1 (imposing taxes on "the taxable income" of the parties listed in that section). As the IRS observes in its brief, "[i]n the typical case where an S corporation or Q-sub receives income, the shareholder has the ability to extract the income from the corporation in order to pay the taxes due on that income." (IRS Opening Br. at 29.) *See also supra* notes 2 and 4 (discussing the "flow-through" nature of S-corps). If a bankruptcy trustee is permitted to avoid the termination of a debtor's S-corp or QSub status, then any income generated during or as part of the reorganization process (such as from the sale of assets) is likely to remain in the corporation, and ultimately in the hands of creditors, but the resulting tax liability must be borne by the S-corp shareholders. The *Trans-Lines West* decision, despite its flaws, clearly recognized that unfairness:

> The Trustee's successful challenge of the Debtor's revocation of its Subchapter S status in the present case would have dire tax consequences to the non-consenting shareholder. Upon the Trustee's sale of the Debtor's real estate, the liability for any capital gain would be passed on to the shareholder. Conversely, in its present C corporation status, the Debtor's estate will be liable for the capital gains tax.

203 B.R. at 660 n.9. *Trans-Lines West* treated that inequitable outcome as indicating a problem with the bankruptcy trustee's standing to challenge the transfer of a supposed property interest in a debtor's S-corp status without

41

the consent of the company's shareholders. *Id.* at 660. That bit of *Trans-Lines West* is true enough. But the inequity also calls into question the soundness of the court's holding that an entity's tax status is property in the first place. "Under the scheme contemplated by the Bankruptcy Code, a debtor's creditors are typically compensated to the extent possible and in as equitable a fashion as possible ... after the trustee marshals the debtor's bankruptcy property ... ." *Westmoreland*, 246 F.3d 251. It would be impossible for a trustee (or a debtor-in-possession) to "marshal" a debtor's S-corp status and use it to compensate creditors, as that status is not controlled by the debtor and has no realizable value.

For all these reasons, we decline to follow the rationale of *Trans-Line West* and its progeny, and we conclude that S-corp status is not "property" within the meaning of the Code.

### ii. MSC II's QSub Status as "Property"

QSub status is an *a fortiori* case. As with S-corp status, the I.R.C. does not (and cannot) guarantee a QSub "the unrestricted right to [the] use, enjoyment and disposition" of that status, *see Trans Lines West*, 203 B.R. at 661, because it depends on a variety of factors that are entirely outside the QSub's control. The QSub has an even weaker claim to the control of its status than does an S-corp. The use and enjoyment of its entity tax status is not only dependent on its S-corp parent's continuing to own 100 percent of its stock, *see* I.R.C. § 1361(b)(3)(B)(i), (b)(3)(C)(i), but also on the parent's decision to not revoke the QSub election, *see id.* § 1361(b)(3)(B)(ii), as well as the parent's continuing status as an S-corp, *see id.* § 1361(b)(3)(B)(i). That last

42

contingency, in turn, depends on the S-corp contingencies already discussed.[22] Therefore, a QSub's use and enjoyment of its tax status may be terminated by factors not only outside its control, but outside the control of its S-corp parent.

Nor can the QSub transfer or otherwise dispose of its QSub status. "As a practical matter," rights to which a debtor asserts a property interest "must be readily alienable and assignable," *Westmoreland*, 246 F.3d at 250, to fulfill the equitable purpose of bankruptcy, which is to generate funds to satisfy creditors. *See id.* at 251 (holding that a license for which few entities other than the debtor would qualify was not a property interest of a bankruptcy estate because it is "dubious, as a practical matter, that any potential buyers would actually bid for that right"). QSub status itself is neither alienable nor assignable, and an S-corp that wishes to sell its QSub and preserve its tax status can only sell it to another S-corp that is willing to purchase 100 percent of its shares and to make the QSub election. *See* I.R.C. § 1361(b)(3)(B) (setting forth the requirements for QSub status). The subsidiary would no longer qualify as a QSub after any other type of sale, and the I.R.C. expressly provides for the loss of QSub status as a result of a sale of the subsidiary's stock. *See id.* § 1361(b)(3)(C)(ii). Thus, a QSub can hardly be said to control the disposition of the alleged property interest in its entity status. Again, a tax classification over which a debtor has no control and that is not alienable or assignable is not a "legal or equitable interest[] of the debtor in property." 11 U.S.C. § 541(a)(1).

---

[22] *See supra* note 2. The S-corp parent's contingencies include preservation of its own S-corp election which, as discussed above, is controlled by its shareholders.

43

We therefore hold that MSC II's QSub status was not "property" and that the Bankruptcy Court's contrary conclusion was error.

### 2.    *QSub Status as Property of the Estate*

Even if QSub status were property, it would still have to be property "of the estate" for a transfer of that status to be void under Code § 362 or avoidable under § 549. The Code defines "property of the estate" as "all legal or equitable interests *of the debtor* in property as of the commencement of the case."[23]    11 U.S.C. § 541(a)(1) (emphasis added). Notwithstanding "Congress' intention to bring anything of value that the debtors have into the estate," *Prudential Lines*, 928 F.2d at 573 (internal quotation marks omitted), the legislative history of § 541 also demonstrates that it was "not intended to expand debtor's rights against others more than they exist at the commencement of the case." S. Rep. 95-989, at 82 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5868; *see also* 4 Collier on Bankruptcy ¶ 541.06 (15th ed. 1996)) ("Although [§ 541(a)(1)] includes choses in action and claims by the debtor against others, it is not intended to expand the debtor's rights against others beyond what rights existed at the commencement of the case. ... The trustee can assert no greater rights than the debtor himself had on the date the case was commenced.").

As discussed above, whether a tax attribute is property of a corporate entity for purposes of Code § 541 is a function

---

[23] The terms "property of debtor" and "interests of the debtor in property" are co-extensive for purposes of § 541(a)(1). *Begier v. IRS*, 496 U.S. 53, 59 n.3 (1990).

44

of the I.R.C. and related regulations. Even if it were proper to think of S-corp status in terms of "ownership," the ownership question would rightly be decided by considering the S-corp's "flow-through" treatment for tax purposes. *See supra* note 4. For example, an NOL may belong to a debtor that is a "C" corporation, such as in *Prudential Lines*, or to an individual debtor, as in *Feiler* and *Russell*, because "when [a] C corporation and/or ... individuals file[] for bankruptcy, the estate created contain[s] all of their assets[,] [and] [i]ncluded therein [are] their tax attributes, including NOLs." *Official Comm. of Unsecured Creditors of Forman Enters., Inc. v. Forman* (*In re Forman Enters., Inc.*), 281 B.R. 600, 612 (Bankr. W.D. Pa. 2002). However, when an S-corp files for bankruptcy, its estate cannot contain any NOLs because "[u]nder the provisions of the [I.R.C.] ... , the NOL and the right to use it automatically passed through by operation of law to [the] ... S corporation shareholders." *Id.* "Any tax benefits resulting from the NOL and the right to use it inure solely to the benefit of ... shareholders and would not be available to satisfy claims of the corporation's creditors." *Id.*

The same can be said of an S-corp's entity tax status itself. The S-corp debtor is merely a "conduit" for tax benefits that flow through to shareholders. The corporation retains no real benefit from its tax-free status in that, while there is no entity-level tax, all of its pre-tax income is passed on to its shareholders. *See* I.R.C. § 1363(a) (providing that an S-corp is a disregarded entity for federal tax purposes and is not taxed on its income); *United States v. Tomko*, 562 F.3d 558, 576 n.14 (3d Cir. 2009) (en banc) (noting that the shareholders of an S-corp receive their individual shares of the corporation's income, deductions, losses, and tax credits).

For its part, a QSub does not even exist for federal tax purposes. If an S-corp makes a valid QSub election with respect to an existing subsidiary, the subsidiary is deemed to have liquidated into the parent under I.R.C. §§ 332 and 337. Treas. Reg. § 1.1361-4(a)(2).[24] As a result, a QSub is generally not treated as a corporation separate from its S-corp parent. *Id.* § 1.1361-4(a)(1).[25] If a subsidiary ceases to qualify as a QSub – because, for example, its corporate parent is no longer an S-corp – the subsidiary is treated as a new corporation acquiring all of its assets (and assuming all of its liabilities) from the parent S-corp immediately before termination, in exchange for stock of the new subsidiary corporation, under I.R.C. § 351. I.R.C. § 1361(b)(3)(C); Treas. Reg. § 1.1361-5(b). Lastly, a QSub that loses its QSub status cannot return to that status for five years, at which time a new QSub election by the parent S-corp is required. I.R.C. § 1361(b)(3)(D); Treas Reg. § 1.1361-5(c)(1). Pertinent

---

[24] That is what happened in this case; MSC II was incorporated in 2005, and BDI made the QSub election in 2006.

[25] The Debtors argue that a QSub's separate existence "is respected for a number of ... purposes, including various tax purposes as set forth in the U.S. Treasury regulations." (Debtors' Br. in Resp. to Barden Appellants' Opening Br. at 23.) However, the purposes they cite for which a QSub's separate existence is respected (for taxes due on pre-QSub income, employment and excise taxes, and the obligation to file information returns, *see* Treas. Reg. § 1.1361-4(a)(6)- (a)(9)) are the narrow exceptions to the general rule that a QSub has no independent status under the I.R.C., *see id.* § 1.1361-4(a)(1)(i).

regulations thus strongly suggest that a QSub's tax status is not "owned" by the QSub.

If QSub status were property at all, it would be property of the subsidiary's S-corp parent. Because "[t]he desirability of a Subchapter S election depends on the individual tax considerations of each shareholder[,] [t]he final determination of whether there is to be an election should be made by those who would suffer the tax consequences of it." *Kean v. Comm'r*, 469 F.2d 1183, 1187 (9th Cir. 1972). *Trans-Lines West* was correct in that regard. It acknowledged that "[a] corporation's election and revocation of the S corporation status under I.R.C. § 1362 is shareholder driven," and "[a]lthough the corporation is the sole entity that makes the election or revocation under I.R.C. § 1362, both acts are contingent upon various degrees of consent by the corporation's shareholders." 203 B.R. at 660 (citing I.R.C. § 1362(a)(2), (d)(1)(B)).

Moreover, allowing QSub status to be treated as the property of the debtor subsidiary rather than the non-debtor parent, as the Bankruptcy Court did in this case, places remarkable restrictions on the rights of the parent, restrictions that have no foundation in either the I.R.C. or the Code. First, the corporate parent loses not only the statutory right to terminate its subsidiary's QSub election, *see* I.R.C. § 1361(b)(3)(B), (D), but also its right to terminate its own S-corp election, *see id.* § 1361(d). Second, the corporate parent loses the ability to sell the subsidiary's shares to any purchaser other than an S-corp, and would then be required to sell 100 percent of the shares, because any other sale would trigger the loss of the subsidiary's QSub status. *See id.* § 1361(b)(3)(B). Third, the S-corp parent and its

47

shareholders lose the ability to sell the parent to a C-corporation, partnership, or other non-S-corp entity, to a non-resident alien, or to more than 100 shareholders, because any of those transactions would also trigger the loss of the subsidiary's QSub status. *See id.* § 1361(b)(1)(B), (C), (A). Filing a bankruptcy petition is not supposed to "expand or change a debtor's interest in an asset; it merely changes the party who holds that interest." *In re Saunders*, 969 F.2d 591, 593 (7th Cir. 1992). But under the Bankruptcy Court's holding in this case, a QSub in bankruptcy can stymie legitimate transactions of its parent as unauthorized transfers of property of the estate, even though the QSub would have had no right to interfere with any of those transactions prior to filing for bankruptcy.[26]

---

[26] For similar reasons, we question whether the relief that the Bankruptcy Court granted was permissible or appropriate. Code § 550, which authorizes relief for transfers avoided pursuant to § 549, places several limitations on the scope of that relief. First, the trustee may only recover "the property transferred, or, if the court so orders, the value of such property." 11 U.S.C. § 550(a). Therefore, "only net amounts diverted from, that is damages consequently suffered by the creditor body of, a debtor may be recovered" pursuant to § 550. *In re Foxmeyer Corp.*, 296 B.R. 327, 342 (Bankr. D. Del. 2003) (considering a claim under Code § 548). Second, "[t]he trustee is entitled to only a single satisfaction" under § 550. 11 U.S.C. §550(d); *see also HBE Leasing Corp. v. Frank*, 48 F.3d 623, 640 (2d Cir. 1995) (prohibiting an "unjustified double recovery" in an avoidance action); *In re Skywalkers, Inc.*, 49 F.3d 546, 549 (9th Cir. 1995) (applying the "single satisfaction" rule to a debtor's recovery of both a liquor license and the payments made to procure that license).

Third, a debtor may avoid transfers and recover transferred property or its value only if the recovery is "for the benefit of the estate." *In re Messina*, 687 F.3d 74, 82-83 (3d Cir. 2012) (citing 11 U.S.C. §550(a)). A debtor is not entitled to benefit from any avoidance, *id.*, and "courts have limited a debtor's exercise of avoidance powers to circumstances in which such actions would in fact benefit the creditors, not the debtors themselves," *In re Cybergenics Corp.*, 226 F.3d 237, 244 (3d Cir. 2000). Because "the rule is that the estate is dissolved upon confirmation of the plan, ... there is no post-confirmation bankruptcy estate … to be benefitted," and property recovered as a result of an avoidance action after a plan has been confirmed may represent an impermissible benefit to the reorganized debtor. *Harstad v. First Am. Bank*, 39 F.3d 898, 904 (8th Cir. 1994) (citing Code § 1141). For that reason, some courts have required a specific mechanism whereby the prepetition creditors, rather than the reorganized debtor, receive the benefit of a post-confirmation avoidance and recovery of transferred property. *See In re Kroh Bros. Dev. Co.*, 100 B.R. 487, 498 (Bankr. W.D. Mo. 1989) (authorizing relief pursuant to which creditors would receive at least one half of preference recoveries); *In re Jet Fla. Sys., Inc.*, 73 B.R. 552, 556 (Bankr. S.D. Fla. 1987) (authorizing relief pursuant to which creditors would receive 80 percent of the proceeds of preference actions).

The remedy fashioned here by the Bankruptcy Court runs afoul of such limitations. The Bankruptcy Court held that "[t]he revocation of Defendant [BDI's] status as a subchapter 'S' corporation and the termination of MSC II's status as a qualified subchapter 'S' subsidiary are void and of no effect" and ordered that "[t]he Defendants shall take all actions necessary to restore the status of Debtor [MSC II] as a

qualified subchapter 'S' subsidiary of Defendant [BDI]." *Majestic Star Casino*, 466 B.R. at 679-80. However, MSC II had already emerged from bankruptcy and was no longer a wholly-owned subsidiary of BDI. That meant that MSC II "recovered" not only its transferred "property" – its tax-free status that was subject to BDI's claim on 100 percent of its income – but also its ability to retain all of its pre-tax earnings. That represented a double recovery and then some. Likewise, because the relief ordered by the Bankruptcy Court was of indefinite duration, it would continue to benefit MSC II long after its creditors had been compensated and sold their interests, thus impermissibly benefitting MSC II itself as the former debtor.

Relief under § 362 admittedly is not subject to the limitations of § 550 because a transfer that violates the automatic stay is void *ab initio. Siciliano*, 13 F.3d at 749. Nevertheless, under § 362, in order to define the relief due as a result of a void transfer, it is still necessary to identify the postpetition transfer that violated the stay. *See* 11 U.S.C. § 362(a)(3). The Bankruptcy Court failed to do that, and simply treated the revocations at both BDI and MSC II as void. But those revocations were themselves irrevocable, *see* I.R.C. §§ 1361(b)(3)(D), 1362(g); Treas. Reg. § 1.1361-5(c)(1), and the Court's treatment of them as simply void raises a question of whether § 362 "could, under the tax laws of the United States, be utilized to undo previously executed acts." *Forman*, 281 B.R. at 612.

Finally, MSC II no longer qualified as a QSub after the Majestic Plan was confirmed both because it was owned by its former creditors rather than being wholly-owned by an S-corp, *see* I.R.C. § 1361(b)(3)(B)(i), and because those creditors had converted it to an LLC, *see id.* § 1361(b)(3)(B)

50

The Debtors argue that "the manner in which an S-corp or QSub obtains or maintains its status is not determinative" of who holds the property right. (Debtors' Br. in Resp. to Barden Appellants' Opening Br. at 26). They say that "the proper focus is on the fact that, under the Internal Revenue Code, the corporation possesses and enjoys the benefits that result from such status at the time of its chapter 11 petition." (*Id.*) In support of that contention, they cite *In re Atlantic Business & Community Corp.*, 901 F.2d 325 (3d Cir. 1990), for the proposition that "mere possession of property at the time of filing suffices to give an interest in property protected by section 362(a)(3)." (*Id.* at 26-27 (quoting *Atl. Bus. & Cmty. Corp.*, 901 F.2d at 328) (internal quotation marks omitted).)

There are two problems with that argument. First, the holding in *Atlantic Business & Community Corp.* was, by its own terms, limited to possessory interests in real property. *See* 901 F.2d at 328 (holding that "a possessory interest in real property is within the ambit of the estate in bankruptcy under Section 541"); *id.* ("[W]e hold that a debtor's possession of a tenancy at sufferance creates a property interest as defined under Section 541, and is protected by Section 362 ... ."). The case does not support the broad principle that any interest that "benefits" the debtor or that

(requiring that a QSub be a "domestic corporation"). Therefore, treating the revocation of MSC II's QSub status as void pursuant to Code § 362 left that entity in violation of at least those two I.R.C. provisions. "Humpty Dumpty could not be restructured using this scenario." *Forman*, 281 B.R. at 612.

"the corporation possesses and enjoys" (Debtors' Br. at 26) is necessarily property of the estate rather than property of a non-debtor. *Cf.* 11 U.S.C. § 541(a)(1) (limiting property of the estate to "legal or equitable interests of the debtor"). Second, the QSub's S-corp parent – and the parent's ultimate shareholders – have at least as strong an argument that they possess and enjoy the benefits that result from the subsidiary's QSub status due to the pass-through of income, the pass-through of losses which may be used to shelter other income, and the elimination of entity-level tax at the QSub.

Based on the foregoing, we conclude that, even if MSC II's QSub status were "property," it is not properly seen as property of MSC II's bankruptcy estate, and the contrary conclusion of the Bankruptcy Court cannot stand.[27]

---

[27] We also doubt that, even if MSC II's QSub status were property of its bankruptcy estate, the Revocation would constitute a transfer for purposes of Code §§ 549 and 550. The Code defines a "transfer" as, *inter alia*, "each mode, direct or indirect, absolute or unconditional, voluntary or involuntary, of disposing or parting with ... property[] or an interest in property." 11 U.S.C. 101(54)(D) (numbering omitted). "Congress intended this definition to be as broad as possible." *Russell*, 927 F.2d at 418. However, both §§ 549 and 550 presume that a "transfer" requires that there be a "transferee" that receives the property interest conveyed from the debtor. *See* 11 U.S.C. § 549(b) (providing that the trustee has avoidance powers "notwithstanding any notice or knowledge of the case that the transferee has"); *id.* § 550(a)(2) (providing for the recovery of value from "any immediate or mediate transferee of such initial transferee"). There are only two candidates for transferee in this case –

52

C.    *Standing Revisited*

Having determined that a debtor's QSub status is not property of its bankruptcy estate, we return to the question of whether such a debtor has standing to challenge the revocation of that status by its corporate parent.    As discussed in Part III.A, *supra*, an S-corp, "standing alone, cannot challenge the validity of a prior Subchapter S revocation without the consent of at least those shareholders who consented to the revocation." *Trans-Lines West*, 203 B.R. at 660.    "A trustee [or debtor-in-possession] who attempts to challenge the validity of [such] a revocation without such consent is asserting the rights of a third party," i.e., its shareholders, and "does not have standing ... ." *Id.* By analogy, a debtor QSub that seeks to challenge the revocation of its tax status is asserting the rights of a third party, its S-corp shareholder, and can do so only if it can claim third-party standing.    That, in turn, requires that the QSub plaintiff demonstrate both that its S-corp parent "is hindered from asserting its own rights and shares an identity

Barden and BDI – and neither can be said to have been the "transferee" of MSC II's QSub status or of its "right" not to pay taxes on its income.  The Revocation was itself triggered by BDI's revocation of its S-corp status, so that, far from enjoying a transfer of MSC II's tax-free status, BDI itself became a taxpayer.  Likewise, Barden did not somehow become an S-corp or a QSub as a result of the revocations at BDI and MSC II.  The transfer envisioned by the Bankruptcy Court thus seems very far removed from the definition set forth in 11 U.S.C. § 101(54) and suggested by the concept of a "transferee" as that term is used in §§ 549 and 550.

53

of interests with the plaintiff." *Pa. Psychiatric Soc'y*, 280 F.3d at 288.

Neither of those conditions exists in this case. Far from being "hindered," BDI and its ultimate shareholder Barden are both parties to this suit and have effectively defended BDI's right to revoke its own S-corp status and, by extension, the QSub status of MSC II. And far from having an "identity of interests," the interests of MSC II and the other Debtors are diametrically opposed to those of Barden and BDI, onto whom they would like to shift substantial on-going tax liabilities. "The extent of potential conflicts of interests between the plaintiff and the third party whose rights are asserted matters a good deal." *Amato v. Wilentz*, 952 F.2d 742, 750 (3d Cir. 1991). "While it may be that standing need not be denied because of a slight, essentially theoretical conflict of interest, ... genuine conflicts strongly counsel against third party standing." *Id.* We therefore hold that the Debtors lacked standing to initiate an adversary proceeding to seek avoidance of the alleged "transfer" of MSC II's QSub status.

## IV.   CONCLUSION

Sections 362, 549, and 550 of the Code set forth guidelines to determine whether a voidable transfer of estate property has occurred. The Bankruptcy Court's decision, like the S-corp-as-property cases on which it relied, was based in part on the conclusion that "a broad range of property [should] be included in the estate," due to the "Congressional goal of encouraging reorganizations and Congress' choice of methods to protect secured creditors." *Majestic Star Casino*, 466 B.R. at 673. But, as the Supreme Court recently

54

observed, "nothing in the generalized statutory purpose of protecting secured creditors can overcome the specific manner of that protection which the text [of the Code] contains." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2073 (2012).

Given that principle, and for the reasons set forth in this opinion, we will vacate the Bankruptcy Court's January 24, 2012 order and remand this matter with directions to dismiss the complaint for lack of jurisdiction.